FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:    619/239-4599
Facsimile:    619/234-4599

Attorneys for Plaintiff

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN E. COLLINS, individually, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> FIREEYE, INC., DAVID G. DEWALT, MICHAEL J. SHERIDAN, ASHAR AZIZ, and KEVIN MANDIA, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> <u>**CLASS ACTION**</u> |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff John E. Collins ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by FireEye ("FireEye" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by FireEye; and (c) review of other publicly available information concerning FireEye.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired FireEye securities on the open market between January 2, 2014 and November 4, 2014, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      According to the Company's annual report, FireEye is a network security company that develops cyber security and information security products and solutions to defend against advanced cyber threats. FireEye provides a diverse range of products, subscriptions, and services, including threat prevention platforms, threat intelligence, and support and monitoring. FireEye serves more than 2200 customers in over 60 countries and prides itself on being preeminent in the field of network security.

3.      On or about September 20, 2013, FireEye completed its IPO, in which the Company sold 17,450,000 shares of common stock at a price of $20.00 per share. The Offering raised approximately $324.6 million in proceeds for the Company, net of underwriting discounts and commissions, but before deducting paid and unpaid offering expenses of approximately $3.3 million. Bolstered by the Company's acquisition of the Mandiant Corporation, the Company's stock climbed to an all-time high of $95.63 on March 5, 2014.

///
///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

4.      FireEye completed a follow-on offering of its stock on March 6, 2014, during which the Company raised approximately $1.1 billion and sold 14 million shares at $82.00 per share, more than four times the IPO price.

5.      Mere days after the follow-on offering, a significant number of the Company's insiders sold their shares at $79.54, earning tens of millions of dollars in profits. In the ensuing weeks, the Company's stock began a steady decline.

6.      On May 6, 2014, FireEye announced its 2014 first fiscal quarter results, surprising investors and analysts. The Company's $24,252,000 million in product revenue fell meaningfully short of analysts' estimates of $31 million. The Company's stock continued its precipitous decline, plummeting to close at a low of $25.76 on October 10, 2014, down 73.1% from its Class Period high of $95.63 on March 5, 2014. Notwithstanding the Company's declining product revenue and the deceleration of its organic business, Defendants touted FireEye's organic and acquired growth as reasons for optimism and promising future results.

7.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (a) the Company's business model had radically changed from that of a software company with high fixed costs but low marginal costs that would not escalate with increases in subscriber base, to an end-to-end service provider; (b) that the Company's secret strategy would require highly trained professional staff to respond to network security breaches, their number increasing with the customer base; and (c) the Company's costs would therefore escalate incrementally with an increased customer base so that the Company's future profitability was in serious doubt.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant damages.

///

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  FireEye's principal executive offices are located within this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff John E. Collins, as set forth in the accompanying certification, incorporated by reference herein, purchased FireEye common stock at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant FireEye is a Delaware corporation with its principal executive offices located at 1440 McCarthy Boulevard, Milpitas, California 95035.

15.     Defendant David G. DeWalt ("DeWalt") is the current Chairman of the Board and Chief Executive Officer ("CEO"), and has served in those capacities since May 2012 and November 2012, respectively.

16.     Defendant Michael J. Sheridan ("Sheridan") is Chief Financial Officer (CFO) and Senior Vice President of the Company.

17.     Defendant Ashar Aziz ("Aziz") is the Founder, Chief Technology Officer, Chief Strategy Officer, and Vice Chairman of the Board.  He has served as Vice Chairman of the Board, Chief Technology Officer, and Chief Strategy Officer since November 2012, and as a

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

member of the Board of Directors since February 2004.  Defendant Aziz founded the Company in 2004 and served as the CEO until November 2012.

18.    Defendant Kevin Mandia ("Mandia") is Chief Operating Officer ("COO") and Senior Vice President of the Company.  Defendant Mandia is the founder and was CEO of Mandiant prior to its acquisition by FireEye.

19.    Defendants DeWalt, Sheridan, Aziz, and Mandia are sometimes collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, had the authority to control the contents of the Company's disclosures to the SEC and to the market.  Each Individual Defendant received the Company's reports and press releases alleged to be misleading prior to, or shortly after, their issuance. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that adverse facts were not disclosed to, and were being concealed from, the public, and that the Company's public disclosures were materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements are "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

20.    FireEye is a pioneer of a purpose-built, virtual machine-based security platform that provides real-time threat protection and prevention to its clients worldwide.  The Company's products detect and block cyber threats to Web, email, and file, and provide malware analysis. Founded in 2004, the Company sought to provide a range of new and innovative solutions for enhanced network security in a climate of escalating and increasingly sophisticated cyber attacks on enterprises and governments.  The Company aimed to supplement traditional signature-based defense technology, such as next-generation firewalls, Intrusion Prevention Systems ("IPS"), anti-virus, and gateways, which are only effective in detecting malware that matches existing signatures or fingerprints from past attacks but cannot stop new and advanced threats that have not yet been detected, leaving security holes in networks.

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

21.     From 2004 to 2008, FireEye researched and developed its virtual, machine-based technology.  In 2008, the Company released its first product, the Web Malware Protection System ("Web MPS"), and subsequently expanded its platform with Email MPS, File MPS, and NX 1000.  According to the Company's website, "the FireEye threat prevention platform delivers multi-vector threat intelligence and partner interoperability to create a cross-enterprise protection fabric that stops today's cyber attacks" and "enables rapid detection, validation, and response to cyber attacks that are increasingly sophisticated and successful at evading current defensive technologies."

22.     FireEye's Threat Prevention platform portfolio includes Web Threat Prevention (NX Series), Email Threat Prevention (EX Series), File Threat Prevention (FX Series), Forensic Analysis System (AX Series), and Endpoint Threat Prevention System (HX Series).  According to FireEye's website, the Central Management System (CM Series) consists of central management platforms that "consolidate the management, reporting, and data sharing of the FireEye NX, EX, FX, and AX products," and distributes threat intelligence in real time, helping the entire organization stop targeted attacks.  The CM Series also "enables centralized configuration, management, and reporting." The Company also offers subscription services, including Dynamic Threat Intelligence Cloud (DTI), Managed Defense, and Cloud Based Platforms.

23.     The Company states that it generates revenue from the sales of its products, subscriptions, and services, the vast majority of which it sells to distributors, resellers, and strategic partners, with a smaller percentage going directly to end consumers.  According to FireEye's most recent quarterly report on Form 10-Q, filed with the SEC on August 13, 2014, the Company's customer base includes approximately 2,500 end-customers across 65 countries, including 150 companies in the Fortune 500.  FireEye, Inc., Quarterly Report (Form 10-Q) at 18 (Aug. 13, 2014).

24.     On or about September 20, 2013, FireEye completed its IPO, in which the Company sold 17,450,000 shares of common stock at a price of $20.00 per share.  According to the Company, the Offering raised approximately $324.6 million in net proceeds for the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Company, net of underwriting discounts and commissions, but before deducting paid and unpaid offering expenses of approximately $3.3 million.

25.     On November 14, 2013, the Company filed its Form 10-Q with the SEC reporting its third quarter fiscal year 2013 financial results.   The Company achieved total revenue of $42,652 for the quarter ending September 30, 2013.   The Company described its business model as follows:

> We generate revenue from sales of our products, subscriptions and services.   Our product revenue consists **primarily of revenue from the sale of our MPS portfolio of software-based appliances, consisting of our Web MPS, Email MPS and File MPS, as well as sales of our MAS and CMS appliances.**   We offer our MPS portfolios as a complete solution to protect the various entry points of a customer's network from the next generation of cyber attacks.

FireEye, Inc., Quarterly Report (Form 10-Q) at 22 (Nov. 14, 2013).  (Emphasis added).

### A.     FireEye Acquires Mandiant

26.     On January 2, 2014, the Company issued a press release announcing its acquisition of Mandiant, a privately held cybersecurity company.  Although the transaction had closed on December 30, 2013, it was not publicly announced until after the close of trading on January 2, 2014.  The financial terms of the merger required FireEye to issue an aggregate of 21.5 million shares and options to purchase shares of FireEye stock and pay approximately $106.5 million of net cash in the transaction to former Mandiant security holders.  FireEye represented that "[t]he acquisition, which recognizes the ever-increasing intensity of cyber attacks and follows nearly two years of collaboration, creates the industry's leading advanced threat protection vendor with the ability to find and stop attacks at every stage of the attack life cycle."  Press Release, FireEye, FireEye Announces Acquisition of Mandiant (Jan. 2, 2014).  At the time, FireEye stated that the combination of the two companies "brings together two highly complementary companies, each a recognized leader and innovator in security, and creates an organization uniquely qualified to meet organizations' needs for real-time detection, contextual threat intelligence, and rapid incident response."  *Id.*  According to the press release, FireEye had

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

pioneered a novel solution for real-time, dynamic threat protection while Mandiant was "an acknowledged leader in endpoint security, incident response, and remediation, with more than two million endpoints installed globally." *Id.* The press release quoted Defendant DeWalt as stating: "Organizations today are faced with knitting together a patchwork of point products and services to protect their assets from advanced threats. . . . Together, the size and global reach of FireEye and Mandiant will enable us to innovate faster, create a more comprehensive solution, and deliver it to organizations around the world at a pace that is unmatched by other security vendors." *Id.*

27.    On the same date, the Company issued a separate press release announcing that its preliminary revenue and billings results for the 2013 fourth fiscal quarter exceeded its fourth-quarter revenue guidance. The Company stated that it expected total fourth quarter revenue to be in the range of $55 to $57 million, exceeding the prior guidance of $52 to $54 million. Press Release, FireEye, FireEye Announces Fourth Quarter and Fiscal Year 2013 Revenue and Billings Exceeded Guidance Ranges (Jan. 2, 2014). The Company also announced that it expected total revenue for 2013 to be between $159 and $161 million, which exceeded the previous guidance of $156 to $158 million. The Company expected total fourth quarter billings to be in the range of $95 to $100 million, up from the previous guidance of $82 to $86 million, and total billings for the year to be between $254 and $259 million, up from the previous guidance of $240 to $245 million. *Id.* In addition, the Company revised its guidance ranges for 2014 billings and revenue to reflect the Mandiant acquisition. The Company stated that it expected total revenue for 2014 to be in the range of $400 to $410 million, increased from the previous range of $240 to $250 million. *Id.* In addition, the Company expected total billings for 2014 to be within the range of $540 to $560 million, increased from the previous expected range of $350 to $370 million. *Id.*

28.    On this news and the news of the Mandiant acquisition, the Company's stock rose from a pre-announcement close of $43.61 per share on December 31, 2013, to close at $57.02 on January 3, 2014.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

29.    In a January 2, 2014 article, *The New York Times* reported on the transaction, noting:

> FireEye's success so far has depended on *a technology for detecting attacks that works quite differently from most antivirus products*. Most products monitor the web and identify malicious software that has already begun to hit victims around the world.
>
> But by the time the attack has been identified and blocked, the malicious software has already had a chance to do damage — siphoning a company's trade secrets, erasing data or emptying a customer's bank account.
>
> FireEye's software isolates incoming traffic in virtual containers and looks for suspicious activity in a sort of virtual petri dish before deciding whether to let the traffic through.

Nicole Perlroth & David E. Sanger, *FireEye Computer Security Firm Acquires Mandiant,* N.Y. TIMES, Jan. 2, 2014, http://www.nytimes.com/2014/01/03/technology/fireeye-computer-security-firm-acquires-mandiant.html. (Emphasis added). The article quoted Defendant DeWalt as stating that "[c]ompanies are spending tens of billions of their money on a model that doesn't work . . . . It's going to take people and products working together." *Id.*   Mandiant was known for its emergency responses to "attackers who have implanted software into corporate computer systems" and frequently responded to attacks that FireEye discovered by using "its own threat detection technology to determine where the attack was coming from and to design countermeasures." *Id.*   According to the article, Defendants DeWalt and Mandia, the CEO of Mandiant, had stated that the combined company would be "able to notify its customers as soon as it detected abnormal behavior, execute a temporary fix and then dispatch a Mandiant team to take further steps." *Id.*

30.    The above statements were materially misleading and/or contained material omissions to the extent that FireEye was already shifting to a dramatically different business model that would escalate its costs as its customer base grew.  The Mandiant acquisition began the clear, but at the time undisclosed, move from a software product model to a service-oriented model—a change with enormous implications for FireEye's valuation.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

31.     On February 11, 2014, FireEye issued a press release announcing its financial results for the fourth fiscal quarter of 2013 and for fiscal year 2013.  For the quarter, FireEye reported billings of $97.9 million, an increase of 102% from the prior year's comparable period.  Press Release, FireEye, FireEye Reports Financial Results for Fourth Quarter and Fiscal Year 2013 (Feb. 11, 2014).  Total revenue for the quarter was $57.3 million, an increase of 81% from the prior year's comparable period.     Within revenue, 56.4% was product revenue of $32.3 million, which also exceeded the prior year's comparable period by 59%.  In addition, 43.6% of total revenue was comprised of subscription and services revenue of $25.0 million, which represented a 120% increase from the prior year's comparable period.  Within subscription and services revenue, product subscription revenue was $14.4 million, an increase of 107% from the prior year's comparable period.  Of total revenue, 25.1% was product subscription revenue. FireEye's 2013 billings were $256.6 million, up by 98% from the prior year.  *Id.*    Combined product and product subscription revenue represented 81% of total revenue and increased 71% from the fourth quarter of 2012 to $46.7 million.  Total revenue for 2013 was $161.6 million, which exceeded the prior year's revenue by 94%.  Within total revenue, 54.6% was product revenue of $88.3 million, which represented an increase of 69% from the prior year's product revenue.  *Id.*  Of total revenue, 45.4% was subscription and services revenue for 2013 of $73.3 million, an increase of 136% from the prior year.  Within subscription and services revenue, product subscription revenue was $43.0 million, an increase of 127% from the prior year.  *Id.* Product subscription revenue was 26.6% of total revenue.   Combined product and product subscription revenue increased 84% from 2012 to $131.3 million.  *Id.*

32.     On March 3, 2014, the Company filed its Form 10-K with the SEC announcing its financial results for the full fiscal year 2013 and for the fourth quarter of fiscal year 2013.  The Company's 10-K reaffirmed the financial results previously announced on February 11, 2014.

33.     The Company's stock climbed to a record high of $95.63 per share at the close of trading on March 5, 2014.

///

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**B.**    **Insider Sales Follow The Company's Secondary Offering**

34.    On March 6, 2014, the Company completed its follow-on stock offering (the "Secondary Offering").  The Secondary Offering brought in approximately $446.5 million and sold 5,582,215 shares at $82.00 per share, more than four times the IPO price.

35.    As part of the March 6th Secondary Offering, various officers sold a total of 1,878,879 shares, including the following sales by the Individual Defendants:

- Defendant DeWalt sold 485,656 shares at $79.54 per share for $38,629,078

- Defendant Aziz sold 1,043,904 shares at $79.54 for $83,032,124

- Defendant Mandia sold 227,586 shares at $79.54 for $18,102,190

- Defendant Sheridan sold 121,733 shares at $79.54 for $9,682,642

36.    In the weeks that followed the Secondary Offering and the insider stock sales, the Company's stock declined steadily, dropping to close at $61.57 by the end of the month on March 31, 2014.

37.    On April 15, 2014, Gabelli & Company analyst Hendi Susanto reiterated a "Sell" rating on the Company based on "valuation, margin of safety considerations, and potential market competition."  Hendi Susanto, *Hacked? Who Ya Gonna Call?,* GABELLI & CO., Apr. 15, 2014 at 1.  Specifically, Susanto noted that "the valuation premium is still excessive" and that there are "potential downside risks including high market expectations of future growth, rising market competition, ***uncertainties on the success of future product roadmap***, and the magnitude of market opportunities where the company can capitalize."  *Id.*  (Emphasis added).  The report summarized the Company's growth plans for 2014:

> - Accelerate customer acquisitions through new channels, geographies, and small-medium business market
>   - FireEye is going to set up and build its partner and sales capacity for accelerated sales growth in 2015. It is also planning to set major partnerships with global consulting and telecommunications companies
>   - Leverage, up-sell and cross-sell new products and services into its existing customer base of 1,964 at the end of 2013
>   - Launch new products
>   - Roll-out cloud and service offering globally

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

*Id.* at 5.

38.     The report stated: "We have a 2015 PMV of $35 based on 10x EV/revenue []. We think the market is currently focusing on FireEye's top-line growth, not fundamentals." *Id.* at 7. The report concluded: "***We will be more optimistic if we see stronger fundamentals of profitability*** and cash flow generation, including acceleration of operating leverage, faster top line growth trajectory than our estimates, and demonstrated abilities to dominate the network security field against rising competitors." *Id.* at 8.  (Emphasis added).

C.     <u>Negative Market Response As Product Revenue Declines</u>

39.     On May 6, 2014, FireEye issued a press release entitled, "FireEye Reports Financial Results for First Quarter 2014," announcing its 2014 fiscal first quarter financial results.  Therein, in relevant part, the Company stated:

**First Quarter 2014 Financial Results**

- **Billings:** First quarter billings were $99.2 million, compared with the previously issued guidance range of $84 to $88 million. Total billings included $26.1 million in product billings, $39.4 million in product subscription billings, $18.0 million in professional services billings and $15.7 million in support and maintenance billings.

- **Revenue:** First quarter revenue was $74.0 million, compared with the previously issued guidance range of $70 to $72 million. Total revenue included $24.3 million of product revenue, $22.8 million of product subscription revenue, $16.2 million of professional services revenue, and $10.8 million of support and maintenance revenue.

- **Deferred revenue:** Deferred revenue totaled $212.7 million at the end of the first quarter, an increase of $25.2 million from December 31, 2013. Current deferred revenue was $121.4 million, an increase of $10.9 million from December 31, 2013. Long-term deferred revenue was $91.3 million, an increase of $14.3 million from December 31, 2013.

- **GAAP net loss:** First quarter GAAP net loss was $101.2 million, or $0.76 per share, based on 134.0 million

weighted average shares outstanding. This compares with a GAAP net loss of $27.0 million, or $1.78 per basic and diluted share, based on 15.2 million weighted average shares outstanding, in the first quarter of 2013.

▪ **Non-GAAP net loss:** First quarter non-GAAP net loss was $71.4 million, or $0.53 per basic and diluted share, compared to the previously issued guidance range of a loss of $0.51 to $0.56 per share. Non-GAAP net loss in the first quarters of 2013 and 2014 excluded stock-based compensation expenses and amortization of intangible assets. Non-GAAP net loss for the first quarter of 2014 also excluded discrete tax benefits related to the Mandiant acquisition and acquisition-related expenses. Non-GAAP net loss for the first quarter of 2013 also excluded changes in the fair value of preferred stock warrant liabilities.

* * *

"We are off to a strong start in 2014, with billings and revenue above our guidance," said David DeWalt, FireEye chairman of the board and chief executive officer. "We continued to redefine the security landscape as we executed on our strategic roadmap, integrating Mandiant's operations, introducing multiple new products, and expanding our global reach with new reseller and service provider partners. As a result, we are a larger, more diversified company, and our security platform has never been more differentiated."

"We are changing the game again and creating the new category of enterprise security forensics with our pending acquisition of nPulse," added DeWalt. "Like FireEye and Mandiant, nPulse is a pioneer and innovator in cybersecurity, and we are looking forward to welcoming the team to the FireEye family."

Press Release, FireEye, FireEye Reports Financial Results for First Quarter 2014 (May 6, 2014). (Internal citations omitted).

40.      In other words, FireEye's quarterly product revenue was 32.8% of total revenue, product subscription revenue was 30.8% of total revenue; professional services revenue was 21.9% of total revenue, and support and maintenance revenue was 14.6% of total revenue.  It

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

was now impossible to conceal effectively that FireEye was migrating to a business model heavier on services and subscriptions, and would no longer primarily focus on product sales.

41.    On the same day, FireEye issued a separate press release announcing that FireEye had entered into an agreement to acquire the privately-held nPulse Technologies, a network forensics company.  The acquisition was expected to close during the second quarter of 2014. FireEye represented that the acquisition would expand the Company's existing security platform in several respects, including the following: "[a] FireEye will offer the industry's first Enterprise Forensics solution with a unified view of network to endpoint forensics, enabling enterprises to minimize risk and drive down mean time to resolution[;]  [b]  The Enterprise Forensics solution, coupled with the FireEye threat analytics solution, will form a comprehensive intelligence platform[;]  [c]    The FireEye Network Threat Prevention Platform combined with newly introduced IPS capabilities and the addition of nPulse's forensics will offer a comprehensive threat management platform; [; and] [d] The Enterprise Forensics solution together with FireEye Managed Defense™ will enable the industry's ***most advanced managed service capabilities***, bringing together deep visibility and rich context from Enterprise Forensics with active defense capabilities of the Managed Defense portfolio."   Press Release, FireEye, FireEye Enters Agreement to Acquire nPulse Technologies (May 6, 2014).  (Emphasis added).  The addition of a forensics arm further committed the Company to the service provider course and moved it farther from the software seller that the investing public had supported strongly from IPO through the Secondary Offering.

42.    On May 6, 2014, Defendant DeWalt also published a post on FireEye's blog stating that the acquisition was "a vital part of [the Company's] long-term strategy to build a single security platform that protects against the most advanced threats and offers customers one solution to detect, contain, resolve and prevent threats."   According to DeWalt, combining nPulse enterprise forensics with the FireEye platform would "***enable incident investigation and remediation*** that no other security vendor can match."  Dave DeWatt, *FireEye Enters Agreement to    Acquire    nPulse* Technologies, FIREEYE  BLOG (May    6,    2014),    http://

www.fireeye.com/blog/author/dave-dewalt. (Emphasis added). Defendant DeWalt further detailed the benefits of the planned acquisition:

> nPulse extends our reach into an organization's history because it can log all network activity for as long as they choose to retain that data. With the industry's fastest lossless, intelligent capture and retrieval, nPulse gives us the ability to "go back in time" to see the full extent of how malicious code behaved on the network. By **being the first to deliver end-to-end (network and endpoint) detection and forensics at scale**, FireEye enables enterprises to minimize risk by **quantifying the impact** of a breach while **accelerating detection and resolution** from days to a matter of minutes. For our Mandiant team and partners, this means we can deliver better **service** and more comprehensive incident response capabilities.
>
> And most importantly, by reducing **incident investigation time**, providing validated breach information and improving the quality of alerts, our customers and clients can reduce their exposure to attacks while substantially reducing operational expenses.

*Id.*

43.    On May 7, 2014, Cowen and Company analysts Gregg Moskowitz and Matthew Broome issued a research report entitled "Good Billings Upside, But Product Revs Light," noting that although they maintained a "favorable opinion of [management]," the Company's quarterly product revenue fell well below analysts' $31 million estimate for the quarter: "product revenue of $24m (+62% y/y but down 25% q/q) was disappointing and fell meaningfully short of the Street's [] $30m forecast." Greg Moskowitz and Matthew Broome, *Good Billings Upside but Product Revs Light*, Cowen and Co., May 7, 2014 at 1.

44.    On May 8, 2014, Gabelli & Company analyst Hendi Susanto changed his recommendation from "Sell" to "Hold" on the Company's stock:

> We believe FireEye has strong credentials, an industry leading position, and the de-facto status in offering of virtual machine-based security platforms, incident response, and managed defense services in advanced cyber threats.

Hendi Susanto, *Changing Recommendation to Hold*, Gabelli & Co., May 8, 2014 at 1.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

45.     Notwithstanding FireEye's disappointing first quarter product revenue, Defendant DeWalt appeared optimistic in a May 7, 2014 interview with CNBC, touting the Company's quarterly performance and his expectations of future profits.  When directly questioned about the organic deceleration in revenues, licenses, and bookings, Defendant DeWalt stated that he was growing the business but revealed that the Company's business model had changed:

> . . . . What I'm focused on doing is growing this business. We had a 132 percent growth year over year. I'm sure you saw that. Both the Mandiant portion of the business, which we acquired just 90 days ago, grew greater than 50%, the FireEye business greater than 50%. All the top line metrics were very strong. I think what the market missed just a little bit in terms of how we described it was, we have multiple components now. . . **and the business has changed quite a bit. We have a product component, we have a product subscription component, we have a services component, and a support component.** When looked at in total, we grew very, very well, well over a 100%. If you break down the pieces, people are looking at that and saying, could there be weakness, what was happening organically or inorganically on those numbers, but **the way we run our business now and the way the security model works, you have to look in totality of all the components together.** We felt a lot of health in the business this past quarter. It was a record quarter from transactions, big deals, a number of assisted deals with partners.  You know, across the board, it was a, it was a really good quarter.

*Fast Money 05/07/14*, CNBC (May 7, 2014), http://www.castroller.com/podcasts/Cnbcs FastMoney/4052460.  (Emphasis added).  A CNBC anchor pressed further: "I mean, what's going on in the organic business here? That's really the core question."  In response, Defendant DeWalt explained, in relevant part:

> Well, one of the things that occurred this past quarter is, **the organic business got blended with the Mandiant components and so all the FireEye sales force around the world was able to sell both the Mandiant products and the FireEye products. So, from the first day of the quarter, every product was treated equal. So, products or product subscriptions or services or support was all equal. So one of the things that occurred was we blended our growth model across a lot of new products, which is a good thing,**

*that's what our customers are asking for. They want a people and a product type of technology. And we think that market opportunity is huge.* See then when I look at it on just an organic basis. And it didn't decelerate, the business for FireEye was very, very strong in the quarter, it moved a little bit from a product component only to a product subscription component but that's where our SAS model comes in, that's where the cloud components are, so when you look at them in totality, it was a very strong quarter for the company, we raised guidance again, this was the fourth time we've raised guidance in 6 months, so we've been doing very well in terms of the company's operations, the business and, uh, we hope the future's really bright.

*Id.* (Emphasis added).   DeWalt's admission that FireEye had for the whole quarter internally thought of product and service revenue as "equal" was an admission of the abandonment of what analysts believed was FireEye's core, "organic" business—the selling of software products. DeWalt admitted not only to have given up on that approach, but to have made that decision at the outset of the quarter.

On the issue of investor expectations and the stock's performance, Defendant DeWalt defended the Company's financial performance and touted the Company's potential for future growth and profitability:

. . . . [W]e've set a guidance every quarter and at the beginning of the year, we gave a full guidance and then we set a Q1. We not only exceeded the guidance that we set, we exceeded the consensus, and we exceeded it by $11 million on billings from $88 to $99 million in billings. We exceeded it on revenue. All the major metrics were exceeded pretty strong and we raised them for the full year. So while I can't control whisper numbers and what Wall Street's thinking high-growth companies can be, a 132% growth, record numbers in new customers, you know, expansion around the world is what we were doing. You know, we're very optimistic. This market is really ripe for disruption. FireEye's doing that. Now we have from 4 products to 20 products and *I think if you look a year or two from now, you'll see a very strong company, a very wide company in terms of our operation, and a very profitable company as well.*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

*Id.*  (Emphasis added).  On the impending lockup expiration in May 2014 in which millions of

shares would come to market, Defendant DeWalt maintained that the Secondary Offering was a

success:

> Well, first of all, the follow on offering we did back in March was very good for the shareholders, for the company, we raised 446 million dollars of cash for the balance sheet. We actually let off some of the steam for the secondary at the same time and we had the lockup in March. But you're right, we actually have 91 million shares coming up for lockup expiration on May 21, but if you break down the components of those shares, we have 17 million of them in executives and senior executives and the top three officers, including myself, are not planning to sell. We don't have trading plans to sell and the rest of the executive team have cap limits so we have a very strong insider policy model for selling, and then on top of that, almost 40 million of the shares are held by Board member venture capitalists so we have a little more control over selling and open and close windows and they're a lot more disciplined in the marketplace as well. So while there is a big lockup expiration, and that's probably one of the biggest reasons for the overhang on the stock right now, you know, most companies who go public, can do these offerings, have these moments. We had a high rise, it occurred, we had some drop, it happened, but I think again, if you look over the long haul what we're building, how important cybersecurity is, how important this technology FireEye has . . . I think it's a good, a good bet and a good company.

*Id.*  CNBC's Brian Kelly further questioned Defendant DeWalt about the insider stock sales in

March 2014: "Why were you selling? You've lost credibility with me. . . No one believes you

anymore."  In response, Defendant DeWalt stated, in relevant part:

> You know, my selling was consistent with all the executives, all the insiders. I still have 90 plus percent of all my holdings in FireEye. I'm highly motivated to grow shareholder value and for a lot of the shareholders, you know, we're going to work very hard to improve the value of this company over the long haul. I have a lot of track record of doing so. I apologize to you if you feel like you lost, you know, faith in me. But I'm going to work hard for you, I will be there. We are growing the company, you know, very effectively across every key metric and timing is timing. I can't control all of that. What I can control is the business and I can control the growth and I can control the market share that we have

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1    and I think if you look at all those metrics and you look at it the
2    long haul, I think you've got a good asset here.

3    *Id.*

4    46.    FireEye's stock experienced another sharp drop in recognition of the new,

material information about FireEye's business model, dropping from its previous close of $37.13

on May 6, 2014, to close at $28.65 on May 7, 2014, a fall of 22.8 % on that day alone.

7    47.    On May 9, 2014, the Wall Street Journal published an article entitled "Investors:

Don't Play With FireEye."  The article stated that a "selloff over the past two months has

chopped more than two-thirds from FireEye's market value."  The article went on to explain that

despite FireEye's standing in the cybersecurity market, "good isn't always good enough,

especially in a turbulent stock market where ***investors have fallen out of love with a class of***

***companies that provide Web-based software services to businesses***."  Indeed, "these so-called

cloud stocks share common traits, such as ***rapid revenue growth, escalating operating losses***

***and valuations that were considered frothy by any measure until hard selling began earlier***

***this year***."  The article stated that "[m]any FireEye investors may feel ***especially burned***. On its

first trading day in September, the stock opened at more than double its initial public offering

price of $20. By March, it had shot past $95. Today, it trades at less than $30."  Dan Gallagher,

*Investors:  Don't Play with FireEye,* WALL ST. J., May 9, 2014, at C8. (Emphasis added).

19    48.    On May 14, 2014, FireEye filed its Quarterly Report with the SEC on Form 10-Q

for the 2014 fiscal first quarter.  The Company's Form 10-Q reaffirmed the financial results

previously announced on May 6, 2014.  The Company reported $24,252,000 in product revenue

for the first fiscal quarter of 2014.  FireEye, Quarterly Report (Form 10-Q) (May 14, 2014).

23    49.    On June 16, 2014, the *Wall Street Journal* published an article entitled, "FINRA

Reviews FireEye Trading Activity Ahead of Mandiant Acquisition."  According to the article,

the Financial Industry Regulatory Authority ("FINRA") was in the process of conducting a

review of the trading activity in the Company's securities ahead of its announcement of the $1

billion Mandiant acquisition.  The article stated that, in conjunction with the investigation, Alexa

King, the Company's general counsel, had sent an email to certain undisclosed recipients who

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

knew about the acquisition before it was announced on January 2, 2014; the email asked if the recipients had any contact with over 360 individuals and entities between October 23, 2013 and January 2, 2014.  Danny Yadron, *Finra Reviews FireEye Trading Activity Ahead of Mandiant Acquisition,* WALL ST. J., June 16, 2014, http://online.wsj.com/articles/finra-reviews-fireeye-trading-activity-ahead-of-mandiant-acquisition-1402949976.

> ### D.    The Company's Stock Continues To Decline Even As Financial Results Improve

50.    On August 5, 2014, FireEye issued a press release entitled "FireEye Reports Financial Results for Second Quarter 2014," announcing the Company's 2014 fiscal second quarter results.  The Company stated, in relevant part:

> "I am pleased to report strong growth in billings and revenue in the second quarter, which is reflected in our fourth increase to 2014 billings and revenue guidance ranges since our initial public offering in September 2013," said David DeWalt, chairman and chief executive officer of FireEye. "We now expect 2014 revenue in the range of $423 to $430 million and third quarter 2014 revenue to exceed $100 million for the first time."

> "We believe our second quarter results demonstrate the market's endorsement of our virtual machine-based security platform and mark the beginning of the next phase in our evolution from advanced security pioneer to industry leader. This new phase, which follows our startup and hyper-growth phases, is characterized by continued high revenue growth, accompanied by continued progress toward our target long-term financial model," added DeWalt.

> **Second Quarter 2014 Financial Results**

> - **Billings:** Second quarter billings were $113.8 million, compared to the previously issued guidance range of $108 to $112 million. Total billings included $35.6 million in product billings, $42.1 million in product subscription billings, $18.6 million in support and maintenance billings, and $17.5 million in professional services billings.

> - **Revenue:** Second quarter revenue was $94.5 million, compared to the previously issued guidance range of $89 to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

$91 million. Total revenue included $37.7 million of product revenue, $28.0 million of product subscription revenue, $11.9 million of support and maintenance revenue, and $16.9 million of professional services revenue.

- **Deferred revenue**: Deferred revenue totaled $232.0 million at the end of the second quarter, an increase of $129.4 million from the end of the second quarter of 2013. Current deferred revenue was $136.8 million, an increase of $81.1 million from the end of the second quarter of 2013. Non-current deferred revenue was $95.2 million, an increase of $48.3 million from the end of the second quarter of 2013.

- **GAAP net loss**: Second quarter GAAP net loss was $116.8 million, or $0.82 per share, based on 141.9 million weighted average shares outstanding. This compares to a GAAP net loss of $40.2 million, or $2.15 per basic and diluted share, based on 18.7 million weighted average shares outstanding, in the second quarter of 2013.

- **Non-GAAP net loss**: Second quarter non-GAAP net loss was $78.5 million, or $0.55 per basic and diluted share, compared to the previously issued guidance range of $0.58 to $0.63 loss per share. Non-GAAP net loss in the second quarters of 2013 and 2014 excluded stock-based compensation expenses, amortization of intangible assets, acquisition related costs and discrete tax benefits. Non-GAAP net loss for the second quarter of 2013 also excluded changes in the fair value of preferred stock warrant liabilities.

Press Release, FireEye, FireEye Reports Financial Results for Second Quarter 2014 (Aug. 5, 2014). (Internal citation omitted).

51.     Thus, of the Company's total $94.5 million in revenue, 39.9% was $37.7 million of product revenue, 29.6% was $28.0 million of product subscription revenue, 12.6% was $11.9 million of support and maintenance revenue, and 17.9% was $16.9 million of professional services revenue.  Of the Company's total second quarter billings of $113.8 million, 31.3% consisted of $35.6 million in product billings, 37% consisted of $42.1 million in product

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

subscription billings, 16.3% consisted of $18.6 million in support and maintenance billings, and 15.4% consisted of $17.5 million in professional services billings.

52.    On August 5, 2014, reflecting on investors' reactions to the Company's rapidly evolving strategies in the first half of 2014, FBR Capital Markets analyst Daniel Ives stated: "You could almost write a novel about what happened at FireEye from Jan. 1 to early May . . . and it would be a novel that some investors would put in the horror section."  Jeremy C. Owens, *Biz Break: FireEye CEO David Dewalt says online shoppers face increasing danger*, SAN JOSE MERCURY NEWS (Aug. 5, 2014), http://www.mercurynews.com/60-second-business-break/ci_26280989/biz-break-david-dewalt-online-shoppers-face-danger-fireeye.  Having fully understood FireEye's transition to a services-heavy model, analysts and investors could calculate the implications this had for eventual profitability and walked away from the stock in droves.

53.    Gabelli & Company analyst Hendi Susanto maintained a "Hold" rating on the Company's stock on August 5, 2014, noting that "[w]hile we believe FireEye is able to deliver high sales growth, we will focus on its margin progression toward positive free cash flow and its long-term operating margin goal."  Hendi Susanto, *Research Updates – Hold*, GABELLI & CO., Aug. 5, 2014 at 2.

54.    Notwithstanding the improved financial results, the Company's battered stock continued to decline to a close of $30.78 on August 6, 2014, down 11.4% from $34.75 on August 5, 2014.

55.    On September 3, 2014, FireEye issued a press release announcing that a new cloud-based subscription service would be available to its customers.  The Company explained that the FireEye® Threat Analytics Platform™ (TAP™), available for Amazon Web Services (AWS) customers, was a "cloud-based security analytics solution" that "applies FireEye Dynamic Threat Intelligence™ (DTI™) to event data produced by security devices, networks, systems, and applications for attack detection, security monitoring, and incident investigation support" and is "designed to reduce alert noise of typical security tools and enable organizations to focus resources on active incident response and remediation in order to stop attacks."  Press

Release, FireEye, FireEye Introduces Threat Analytics Platform for Amazon Web Services (Sept. 3, 2014).

56.     On November 4, 2014, FireEye issued a press release announcing its 2014 third fiscal quarter financial results.   The Company's third quarter revenue of $114.2 million represented an increase of 168% from the prior year's comparable period, but came in at the low end of the Company's own previously issued guidance range of $114 to $117 million, and missed Wall Street consensus estimates of $116.02 million.   Of the total revenue, 42.4% was $48.4 million of product revenue, 28.7% was $32.8 million of product subscription, 12.4% was $14.2 million of support and maintenance revenue, and 16.5% was $18.9 million of professional services revenue.   The Company's third quarter billings were $165.1 million, which represented an increase of 45% from the second quarter of 2014 and exceeded previously issued guidance of $150 to $155 million.   Of total billings, 26.7% was $44.1 million in product billings, 43.5% was $71.9 million in product subscription billings, 18.6% was $30.7 million in support and maintenance billings, and 11.1% was 18.3 million in professional services billings.   Press Release, FireEye, FireEye Reports Record Billings and Revenue for Third Quarter 2014 (Nov. 4, 2014).

57.     The press release quoted Defendant DeWalt as stating: "Our third quarter billings reflected strong demand for FireEye's advanced security solutions in an environment of escalating targeted attacks. . . . Billings from new and existing customers were both at record levels as FireEye expanded its installed base and successfully cross-sold multi-vector solutions." *Id.* The press release further stated, in relevant part:

**Recent Business Highlights**

Since its initial public offering in the third quarter of 2013, FireEye has executed on a strategy to expand its advanced security platform and increase the installed base of customers.  In the past year, the company

- ▪ Released more than 20 new and enhanced products and services, including new appliances, support for Apple operating environments, a mobile threat prevention solution, a data center threat prevention solution, cloud-

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

based email threat protection, the Threat Analytics Platform™ (TAP™), an Intrusion Prevention System (IPS), and the FireEye-as-a-Service offering.

■ More than doubled its customer base, from 1,349 customers at the end of the third quarter of 2013 to 2,761 customers at the end of the third quarter of 2014.

■ Expanded its presence to more than 65 countries.

■ Expanded its channel partner programs to more than 900 distributors and resellers worldwide.

■ Built 24/7, round-the-clock, round-the-world customer support and security operations centers.

■ Increased the number of employees from 1,164 at the end of the third quarter of 2013 to 2,402 at the end of the third quarter of 2014.

*Id.*

58.    FireEye also indicated that it expected 2014 fourth quarter total revenue in the range of $135 to $147 million.  *Id.*

59.    On November 4, 2014, Defendant DeWalt told *MarketWatch* that "***the switch to a new subscription-based cloud service, which launched in the third quarter, has put 'near-term pressure on revenue*.'"  Jennifer Booton, *FireEye CEO defends revenue miss,* MARKETWATCH, Nov. 4, 2014, http://www.marketwatch.com/story/fireeye-ceo-defends-revenue-miss-2014-11-04.

60.    This constituted the final admission of the process FireEye management secretly began in January 2014: a transition from a maker and seller of security software to a services provider, which had negative implications for growth, revenue, and ultimately profit.  On this news, the Company's shares plunged a further 16.03% to $28.79 on November 5, 2014.

## CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)3 of the Federal Rules of Civil Procedure on behalf of a class, consisting of all those who purchased or otherwise acquired FireEye securities on the open market between January 2, 2014, and November 4, 2014, inclusive, and were damaged thereby (collectively, the "Class").  Excluded

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1  from the Class are Defendants, the officers and directors of the Company, at all relevant times,
2  members of their immediate families and their legal representatives, heirs, successors or assigns
3  and any entity in which Defendants have or had a controlling interest.

4          62.     The members of the Class are so numerous that joinder of all members is
5  impracticable.   Throughout the Class Period, FireEye's securities were actively traded on the
6  NASDAQ, an open and efficient market, under the symbol FEYE.   While the exact number of
7  Class members is unknown to Plaintiff at this time and can only be ascertained through
8  appropriate discovery, Plaintiff believes that there are thousands of members in the proposed
9  Class located throughout the United States.   Record owners and other members of the Class may
10 be identified from records maintained by FireEye or its transfer agent and may be notified of the
11 pendency of this action by mail, using a form of notice similar to that customarily used in
12 securities class actions.

13         63.     Plaintiff's claims are typical of the claims of the members of the Class as all
14 members of the Class are similarly affected by Defendants' wrongful conduct in violation of
15 federal law that is complained of herein.

16         64.     Plaintiff will fairly and adequately protect the interests of the members of the
17 Class and has retained counsel competent and experienced in class and securities litigation.

18         65.     Common questions of law and fact exist as to all members of the Class and
19 predominate over any questions solely affecting individual members of the Class.   Among the
20 questions of law and fact common to the Class are:

21              (a)     Whether Defendants' acts and omissions, as alleged herein, violated the
22 federal securities laws;

23              (b)     whether Defendants' statements to the investing public during the Class
24 Period omitted and/or misrepresented material facts about the business, operations, and
25 management of FireEye;

26              (c)     whether the market price of FireEye common stock was artificially
27 inflated during the Class Period due to the material misrepresentations and omissions and
28 failures to correct the material misrepresentations complained of herein; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

(d)    the extent to which members of the Class have sustained damages and the proper measure of damages.

66.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE INFORMATION**

67.    The market for FireEye's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, FireEye's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired FireEye's securities relying upon the integrity of the market price of the Company's securities and market information relating to FireEye, and have been damaged thereby.

68.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of FireEye's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts about FireEye's business necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about FireEye business, operations, and prospects as alleged herein.

69.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FireEye's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1  unrealistically positive assessment of the Company and its financial well-being and prospects,

2  thus causing the Company's securities to be overvalued and artificially inflated at all relevant

3  times.  Defendants' materially false and/or misleading statements during the Class Period

4  resulted in Plaintiff and other members of the Class purchasing the Company's securities at

5  artificially inflated prices, thus causing the damages complained of herein.

6  ## LOSS CAUSATION

7      70.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

8  the economic loss suffered by Plaintiff and the Class.

9      71.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

10  deceive the market and a course of conduct that artificially inflated the prices of FireEye's

11  securities and operated as a fraud or deceit on Class Period purchasers of FireEye's securities by

12  failing to disclose to investors that the Company's public information and financial results were

13  materially misleading and misrepresented material information.   When Defendants'

14  misrepresentations and fraudulent conduct were disclosed and became apparent to the market,

15  the prices of FireEye's securities fell precipitously as the prior inflation came out of the

16  Company's stock price.  As a result of their purchases of FireEye's securities during the Class

17  Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the

18  federal securities laws.

19      72.    Because Defendants failed to disclose material facts concerning the Company's

20  business model, strategy, and revenue mix, and therefore its profitability, investors were not

21  aware of the true state of the Company's value.  Defendants presented a misleading picture of

22  FireEye's business and prospects and sold a business model to its investors that its management

23  had secretly decided to abandon in favor of one without the same profit potential.  Defendants

24  profited from this misleading picture by selling 1,878,879 shares at inflated prices for total

25  proceeds of approximately $1,878,879.  Thus, instead of truthfully disclosing during the Class

26  Period the true state of the Company's business, Defendants caused FireEye to misrepresent and

27  conceal the truth, causing investors to falsely believe that FireEye remained committed to the

28  business model it had pursued since its IPO, while simultaneously selling their holdings of the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1  Company's shares at a valuation that the Company could not have commanded if it had

2  truthfully disclosed its new business model.

3      73.    Defendants' false and misleading statements caused FireEye's common stock to

4  trade at artificially inflated levels throughout the Class Period.  As a direct result of the

5  Company's problems coming to light, FireEye's common stock price fell precipitously from its

6  Class Period high.

7      74.    The decline in the price of FireEye's common stock after the truth came to light

8  was a direct result of the nature and extent of Defendants' fraud finally being revealed to

9  investors and the market.  The timing and magnitude of FireEye's stock price decline negates

10 any inference that the loss suffered by Plaintiff and the other Class members was caused by

11 changed market conditions, macroeconomic or industry factors, or Company-specific facts

12 unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the

13 other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

14 the price of FireEye's securities and the subsequent decline in the value of FireEye's securities

15 when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

16                            **SCIENTER ALLEGATIONS**

17     75.    As alleged herein, Defendants acted with scienter in that Defendants knew that

18 the public documents and statements issued or disseminated in the name of the Company were

19 materially false and/or misleading; knew that such statements or documents would be issued or

20 disseminated to the investing public; and knowingly and substantially participated or acquiesced

21 in the issuance or dissemination of such statements or documents as primary violations of the

22 federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

23 receipt of information reflecting the true facts regarding FireEye, his/her control over, and/or

24 receipt and/or modification of FireEye's allegedly materially misleading misstatements and/or

25 their associations with the Company which made them privy to confidential proprietary

26 information concerning FireEye, participated in the fraudulent scheme alleged herein.

27 ///

28 ///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

76.    The market for FireEye's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FireEye's securities traded at artificially inflated prices during the Class Period.  On March 5, 2014, the Company's stock closed at a Class Period high of $95.63 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of FireEye's securities and market information relating to FireEye, and have been damaged thereby.

77.    During the Class Period, the artificial inflation of FireEye's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FireEye's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of FireEye and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

78.    At all relevant times, the market for FireEye's securities was an efficient market for the following reasons, among others:

(a)    FireEye stock met the requirements for listing, and it was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, FireEye filed periodic public reports with the SEC and/or the NASDAQ;

(c)    FireEye regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    FireEye was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

79.    As a result of the foregoing, the market for FireEye's securities promptly digested current information regarding FireEye from all publicly available sources and reflected such information in FireEye's stock price.  Under these circumstances, all purchasers of FireEye's securities during the Class Period suffered similar injury through their purchase of FireEye's securities at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

80.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FireEye who knew that the statement was false when made.

///

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>COUNT I</u>

**Violation of Section 10(b) of the Exchange Act and Rule10b-5 Promulgated Thereunder**

**<u>(Against All Defendants)</u>**

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FireEye's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

83.    The Company and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FireEye's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.    The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FireEye's financial well-being and prospects, as specified herein.

85.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FireEye's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

material facts necessary in order to make the statements made about FireEye and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

86.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

87.    The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FireEye's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, the Company and the Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

-31-

1    in failing to obtain such knowledge by deliberately refraining from taking those steps necessary

2    to discover whether those statements were false or misleading.

3        88.    As a result of the dissemination of the materially false and/or misleading

4    information and/or failure to disclose material facts, as set forth above, the market price of

5    FireEye's securities was artificially inflated during the Class Period. In ignorance of the fact that

6    market prices of the Company's securities were artificially inflated, and relying directly or

7    indirectly on the false and misleading statements made by the Company and the Individual

8    Defendants, or upon the integrity of the market in which the securities trades, and/or in the

9    absence of material adverse information that was known to or recklessly disregarded by the

10   Company and the Individual Defendants, but not disclosed in public statements by the Company

11   and the Individual Defendants during the Class Period, Plaintiff and the other members of the

12   Class acquired FireEye's securities during the Class Period at artificially high prices and were

13   damaged thereby.

14       89.    At the time of said misrepresentations and/or omissions, Plaintiff and other

15   members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff

16   and the other members of the Class and the marketplace known the truth regarding the problems

17   that FireEye was experiencing, which were not disclosed by Defendants, Plaintiff and other

18   members of the Class would not have purchased or otherwise acquired their FireEye securities,

19   or, if they had acquired such securities during the Class Period, they would not have done so at

20   the artificially inflated prices which they paid.

21       90.    By virtue of the foregoing, the Company and the Individual Defendants have

22   violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

23       91.    As a direct and proximate result of the Company and the Individual Defendants'

24   wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection

25   with their respective purchases and sales of the Company's securities during the Class Period.

26   ///

27   ///

28   ///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

92.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

93.     The Individual Defendants acted as controlling persons of FireEye within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

95.     As set forth above, FireEye and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

///

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

1

**PRAYER FOR RELIEF**

2
    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

3
        (a)     determining that this action is a proper class action under Rule 23 of the Federal

4
Rules of Civil Procedure;

5
        (b)     awarding compensatory damages in favor of Plaintiff and the other Class

6
members against all Defendants, jointly and severally, for all damages sustained as a result of

7
Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

8
        (c)     awarding Plaintiff and the Class their reasonable costs and expenses incurred in

9
this action, including attorney fees and expert fees; and

10
        (d)     such other and further relief as the Court may deem just and proper.

11

**JURY TRIAL DEMAND**

12
    Plaintiff hereby demands a trial by jury.

13
DATED: November 24, 2014        WOLF HALDENSTEIN ADLER

14
         FREEMAN & HERZ LLP
        FRANCIS M. GREGOREK

15
        BETSY C. MANIFOLD
        RACHELE R. RICKERT

16
        MARISA C. LIVESAY

17

18
           s/ Rachele R. Rickert
        RACHELE R. RICKERT

19
        750 B Street, Suite 2770

20
        San Diego, California 92101
        Telephone: 619/239-4599

21
        Facsimile: 619/234-4599
        gregorek@whafh.com

22
        manifold@whafh.com
        rickert@whafh.com

23
        livesay@whafh.com

24
        RICHARD A. MANISKAS, ESQ.

25
        RYAN & MANISKAS, LLP
        995 Old Eagle School Rd., Suite 311

26
        Wayne, PA 19087
        Telephone: 484/588-5516

27
        Facsimile: 484/450-2582
        rmaniskas@rmclasslaw.com

28
        Attorneys for Plaintiff

FIREEYE:21346 COMPLAINT

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS