UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VIJAY FADIA, et al.,<br><br>              Plaintiffs,<br><br>    v.<br><br>FIREEYE, INC., et al.,<br><br>              FireEye. | Case No.  5:14-cv-05204-EJD<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION TO DISMISS; DENYING**<br>**PLAINTIFF'S MOTION TO STRIKE AS**<br>**MOOT**<br><br>Re: Dkt. Nos. 75, 82 |

Lead Plaintiffs State-Boston Retirement System and Vijay Fadia ("Plaintiffs") filed a Class Action Complaint against FireEye, Inc. ("FireEye") and its Chief Executive Officer David DeWalt ("DeWalt"), Chief Financial Officer Kevin Mandia ("Mandia"), and Chief Operating Officer Michael Sheridan ("Sheridan") (collectively "Defendants") on November 24, 2014.  Dkt. No. 1. Plaintiffs then filed an amended complaint ("FAC") on June 29, 2015.  Dkt. No. 72 ("FAC"). Presently before the court is Defendants' Motion to Dismiss the amended complaint.  Dkt. No. 75 ("Mot.").

Federal jurisdiction arises pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Oral argument on the motion was held on November 19, 2015.  Having carefully reviewed the parties' briefing, the Court GRANTS Defendants' Motion to Dismiss for the reasons explained below.

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

FireEye, a Delaware corporation with its principal executive offices in California, develops and sells products and services that provide real-time detection of and protection from cyber-

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

1   attacks.  FAC at ¶¶ 2, 32.  FireEye sells these products and services via direct and indirect sales

2   teams, primarily targeting large enterprise and government customers.  Id. at ¶ 3.

3        FireEye became a public company in September 2013, and acquired privately held

4   Mandiant Corporation ("Mandiant") shortly thereafter in December of 2013.  Id. at ¶ 6.  Mandiant

5   sells software products that detect cyber-threats on remote devices (i.e. laptops, desktops, laptops,

6   computers, tablets, smartphones etc.) that access a corporate network.  Id.  With its acquisition,

7   FireEye could offer customers products and services that detect threats along both strategic points

8   on the network and on these remote devices.  Id.

9        Both lead Plaintiffs purchased FireEye stock on the open market during the class period[1]

10  and allegedly suffered damages as a result of a drop in FireEye's stock price.  The stock price

11  dropped by 22% on May 7, 2014, 11.42% on August 6, 2014, and 14.98% on November 4, 2014.

12  Id. at ¶ 29.  Plaintiffs allege the stock price declined due to material misrepresentations made by

13  Defendants throughout the class period.

14       Individual Defendants DeWalt, Mandia, and Sheridan were all employed by FireEye

15  through the duration of the class period.  Id. at ¶¶ 33-35.  DeWalt served as CEO from May 2012

16  onwards, Mandia served as FireEye's CFO from 2011, and Sheridan served in the capacities of

17  Chief Financial Officer and Senior Vice President from 2011 onwards.  Id. at ¶¶ 33-35.

18       Plaintiffs allege that Defendants, due to their positions of control and authority, had access

19  to FireEye's internal corporate documents, and participated in drafting, preparing, and approving

20  the statements that gave rise to this lawsuit.  Id. at ¶¶ 37-38.  Plaintiffs further allege that

21  Defendants were obligated to disseminate accurate and truthful information about FireEye's

22  operations and that the alleged misrepresentations were in violation of these obligations.  Id. at ¶

23  40.

24       Plaintiffs also contend that Defendants DeWalt, Mandia, and Sheridan deceived investors

25

26  _____

    The class period spans from January 2, 2014 to November 4, 2014.  FAC at ¶ 1.

27                                             2
    Case No.: 5:14-cv-05204-EJD

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

by distorting the true state of FireEye's business, forcing plaintiffs and other buyers to purchase FireEye's stock at an artificially inflated price.  Id. at ¶ 41.  Plaintiffs also point out that since the alleged misrepresentations were made by individual defendants - all of whom served as senior officers overseeing the company's operations - they are attributable to the company.  Id. at ¶ 42. The misrepresentations and omissions pertain to the Mandiant integration, the Mandiant Infinite Response (or "MIR") endpoint threat detection product, a belated announcement of a change in the revenue recognition policy, an alleged shift in revenue from products to services, the appointment of a new head of sales, and the company's overall financial performance.  Id. at ¶¶ 50; see also Dkt. No. 78 ("Opp.") at 10-15.

Plaintiffs allege that the post-acquisition integration of Mandiant and FireEye was going quite poorly.  Id. at ¶ 107.  FireEye was having trouble merging the two companies' products, retaining its customer base, and fighting off competitors.  Id. at ¶ 140.  Plaintiffs also allege that there was a significant slowdown in sales due to "mass confusion" in the sales force, a lengthening of the sales cycle, and increased competition from the market place – all which Plaintiffs claim Defendants failed to mention in the numerous press conferences, earnings call, and public events held during the class period.  Id. at ¶¶ 140-207.

Plaintiffs contend Defendants also concealed product integration problems, specifically with respect to MIR.  Id. at ¶¶ 67-68.  MIR was designed to monitor 10,000 endpoints (10,000 individual laptops, desktops, tablets, and smartphones), but "was unable to monitor more that 3000-4000 before dropping offline."  Id.  Next, FireEye missed analyst's expectations of $30 million in revenue by only reporting $24.3 million, which allegedly caused the stock price to drop by 22.84%.  Id. at ¶¶ 79, 81.  The next drop in stock price came on August 6, 2014 following an announcement of a change in the revenue recognition policy for FireEye's email products. Plaintiffs contend Defendants informed the public shortly before August 6 that it would recognize the revenue generated by the sale of its email products *at the time of shipment* – a break from to its previous practice of recognizing it pro rata over a three year contract term.  Id. at ¶¶47-49.

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS' MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1    According to Plaintiffs, this change caused an 11.42% drop in FireEye's stock price.  Id.  at ¶22.

2         Plaintiffs also contend that a third drop in stock price of 14.98% occurred due to

3    Defendants' failure to acknowledge an "unexpected shift in revenue from product to services."  Id.

4    at ¶¶ 24, 135.  Analysts surmised that a "slower than anticipated growth" in product revenue was

5    the cause of the drop in stock price.  Id. at ¶ 137.

6         Finally, Plaintiffs allege Defendants reaped significant rewards by selling thousands of

7    shares allegedly within a few days after the Secondary Public Offering.  Id. at ¶¶ 77-78.

8    Specifically, DeWalt, Mandia, and Sheridan sold 485,656, 227,586, and 121,733 shares at a price

9    of $79.54, collecting proceeds in the amounts of $38,629,078.24, $18,102,190.44, and

10   $9,682,642.82 respectively.  Id. at ¶ 78.  Plaintiffs contend that the amount, timing, and

11   consistency of the stocks sales indicate a strong inference of scienter.  Plaintiffs rely on statements

12   made by Defendants, analysts, and seven confidential witnesses ("CW") to support these

13   allegations.  Id. at ¶¶ 65-71, 92-119, 140-209.  Additionally, these allegations form the basis of

14   Plaintiffs claims under sections 10(b), 10b-5(a) and (c), and 20(a).

15        Plaintiffs' commenced this action on November 24, 2014, and filed an amended complaint

16   on August 29, 2015.  Defendants moved to dismiss the FAC - the operative complaint.  Plaintiffs

17   filed an opposition.  This matter has been fully briefed and a hearing was held on November 19,

18   2015.

19   **II.      LEGAL STANDARD**

20        Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

21   specificity to "give the defendant fair notice of what the…claim is and the grounds upon which it

22   rests."  Bell At. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and internal quotations

23   committed).  A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to

24   state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The factual allegations in

25   the complaint "must be enough to raise a right to relief above the speculative level" such that the

26   claim "is plausible on its face."  Twombly, 550 U.S. at 556-57.

27

     Case No.: 5:14-cv-05204-EJD
28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1    In addition to Rule 8's requirements, fraud cases are also governed by the heightened

2    pleading standard of Rule 9(b).  The Rule 9(b) requirement "has long been applied to securities

3    complaints."  Zucco Partners LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009)

4    (citing Semegen v. Weidner, 780 F.2d 727, 729, 734–35 (9th Cir. 1985)).  In accordance with that

5    rule, courts in the past required plaintiffs in securities fraud cases to plead falsity with

6    particularity, while allowing scienter to be alleged generally.  Id.  However, in 1995 Congress

7    enacted the Private Securities Litigation Reform Act (PSLRA), which "significantly

8    altered pleading requirements in securities fraud cases."  Id.  (quoting Gompper v. VISX, Inc., 298

9    F.3d 893, 895 (9th Cir. 2002)).  Under the PSLRA, to survive a motion to dismiss, a plaintiff must

10   now plead both falsity and scienter with particularity.  In re Daou Sys., Inc., 411 F.3d 1006, 1014

11   (9th Cir. 2005).

## III.   EVIDENTIARY ISSUES

### A.   Defendants' Request for Judicial Notice and Plaintiffs' Motion to Strike

14   Defendants ask the court to take judicial notice of 23 documents attached as exhibits 1-22

15   to the Declaration of Doru Gavril in support of Defendant's motion to Dismiss.  See Dkt. No. 76

16   ("Gavril Decl."), ("Exhs. 1-22").  Most of these documents are SEC filings, transcripts from

17   earnings calls, and a chart that includes a compilation of data from exhibits 5, 9, 10, 11, 12, and

18   13.  Plaintiffs assert that Exhibit 1 should be striken from the record because it improperly

19   assumes the truth of the contents of the SEC filings and includes additional attorney calculations

20   of SEC filings.

21   In ruling on a Rule 12(b)(6) motion to dismiss, court "must consider…documents

22   incorporated into the complaint by reference, and matters of which a court may take judicial

23   notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  "Under Federal

24   Rule of Evidence 201, facts subject to judicial notice are adjudicative facts that are not subject to

25   reasonable dispute."  City of Royal Oak Retirement System v. Juniper Networks, Inc., 880 F.

26   Supp. 2d 1045, 1058 (N.D. Cal. 2012) (citations and internal quotations omitted).

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1    Since Plaintiffs object only to Exhibit 1, the court takes judicial notice of Exhibits 2-23,

2    which are comprised of SEC filings and transcripts from earnings calls.  See Id. (citations and

3    internal quotations omitted).  And because the chart in Exhibit 1contains facts subject to

4    reasonable dispute, the court declines to take judicial notice of it.  Therefore, the motion to strike

5    Exhibit 1 is moot.

6    **B.    Plaintiffs' Request for Judicial Notice**

7    Plaintiffs request judicial notice of the following court records: (1) the Consolidated First

8    Amended Class Action Complaint pending in the California Superior Court of Santa Clara

9    County, (2) the Tentative Ruling on Defendants' demurrer in the California Securities Action, and

10   (3) the order after the hearing on July 10, 2015 with respect to the demurrer and joinder to the

11   demurrer in the Consolidated First Amended Complaint.  See Dkt. No. 81 at 2-3.

12   The court grants Plaintiffs' unopposed request for judicial notice of the above documents.

13   See Hanover Insurance Co. v. Fremont Bank, 68 F. Supp. 3d 1085, 1092, n.1 (N.D. Cal. 2014);

14   see also Louis v. McCormick & Schmick Restaurant Corp., 460 F. Supp. 2d 1153, 1155, n.4 (C.D.

15   Cal. 2006) ("Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice

16   of the records of state courts…").

17   **IV.    DISCUSSION**

18   **A.    Sufficiency of the allegations Under the PSLRA**

19   To adequately state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege

20   facts sufficient to establish: "(1) a material representation or omission by the defendant, (2)

21   scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a

22   security, (4) reliance upon the misrepresentation, (5) economic loss, and (6) loss causation."

23   Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Inv.

24   Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

25   **i.    Material Misrepresentation**

26   In order to adequately plead material misrepresentation or omission under § 10(b), the

27

28

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

6

United States District Court
Northern District of California

1    PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason

2    or reasons why the statement is misleading, and, if an allegation regarding the statement or

3    omission is made on information and belief, the complaint shall state with particularity all facts on

4    which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); see also In re Tesla Motors, Inc. Sec.

5    Litig., 75 F. Supp. 3d 1034, 1041-42 (N.D. Cal. 2014).

6        A material misrepresentation differs significantly from corporate puffery.  Puffery is an

7    expression of opinion, while a misrepresentation is a knowingly false statement of fact.  Oregon

8    Public Employees Retirement Fund v. Apollo Group, Inc., 774 F.3d 598, 606 (9th Cir. 2014).

9    Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making

10   investment decisions.  In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010); see also

11   Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 ("…a statement will not mislead even if it

12   is incomplete or does not include all relevant facts") (citations and internal quotations omitted).

13   Finally, "mildly optimistic, subjective assessment[s]…[do not] amount to a securities violation."

14   In re Cutera Sec. Litig., 610 F.3d at 1111.

15       An omission, by contrast, "refers to the failure to disclose material information about a

16   company."  Desai v. Deutsche Bank Sec. Ltd. 573 F.3d 931, 939 (9th Cir. 2009).  "[A]n omission

17   is material if there is a substantial likelihood that the disclosure of the omitted fact would have

18   been viewed by the reasonable investor as having significantly altered the total mix of the

19   information made available."  Juniper Networks, 880 F. Supp. 2d at 1061 (citations and internal

20   quotations omitted) (emphasis added).

21       Additionally, when plaintiffs' rely on statements from confidential witnesses (CW) to

22   support their allegations, the PSLRA's particularity standard must be satisfied.  Personal sources

23   in a complaint must be described "with sufficient particularity to support the probability that a

24   person in the position occupied by the source would possess the information alleged."  In re Daou

25   Sys., 411 F.3d at 1015; see also In re Lockheed Martin, 272 F. Supp. 2d at 940.  Thereafter, a

26   number of decisions in this district have followed the same approach.  See In re OmniVision

27
     Case No.: 5:14-cv-05204-EJD

28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

7

1    Technologies, Inc. Sec. Litig., 937 F. Supp. 2d 1090, 1109 (N.D. Cal. 2013) (same); Wozniak v.

2    Align Technology, Inc., No. C-09-3671-MMC, 2011 WL 2269418, *4 (N.D. Cal. 2012) (same); In

3    re LDK Solar Sec. Litig., 584 F. Supp. 2d 1230, 1256, n.2 (N.D. Cal. 2008) (same); Mulligan v.

4    Impax Laboratories, Inc., 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) (same).

5         "To determine whether a confidential witness is sufficiently reliable, courts look to the

6    level of detail provided by the confidential sources, the corroborative nature of the other facts

7    alleged…[including] the coherence and plausibility of the allegations, the number of sources, the

8    reliability of sources, and similar indicia." Gammel v. Hewlett-Packard Co., No. SACV-11-1404-

9    AG, 2013 WL 1947525, *11 (May 8, 2013) (citations and internal quotations omitted)(emphasis

10   added).

11        Recognizing that the heightened pleading standard applies here, and since the majority of

12   allegations are derived from statements made by confidential witnesses, the preliminary inquiry is

13   whether Plaintiffs satisfy the heightened pleading requirement with respect to these witnesses.

14                           **1.      Confidential Witnesses**

15        Defendants assert that Plaintiffs' allegations derived from CW statements fail to satisfy the

16   heightened pleading requirement because the allegations are impermissibly vague and the CWs

17   lack the personal knowledge necessary to make the allegations. Mot. at 21. Plaintiffs argue

18   otherwise.

19        Plaintiffs rely on statements made by seven confidential witnesses. CW1 is identified as a

20   former Mandiant Sales Engineer and a key advisor to the Mandiant sales team that reported to

21   Mandiant's Worldwide Director of Sales Engineers. He joined and worked for FireEye from July

22   2013 to August 2014 and allegedly made comments about scalability issues related to Mandiant's

23   MIR solution. FAC at ¶¶ 66, 68, 69. CW2 was a former Regional Sales Manager at FireEye from

24   September 2011 to September 2014, sold all of FireEye's products in Florida, Georgia, and

25   Bermuda, and reported directly to the Senior Director of Sales. Id. at ¶92. CW2 stated that the

26   integration added new people that were not knowledgeable about FireEye's products, which

27
     Case No.: 5:14-cv-05204-EJD
28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

1   created issues for field sales personnel.  Id. at ¶ 94.

2       CW3 was a former Senior Director of Infrastructure at FireEye from March 2010 to

3   August 2014, reported directly to the Chief Information Officer, and said that FireEye decided to

4   do a mass lay-off in August because "the integration was not going well."  Id. at ¶¶102-103.  CW4

5   was a former Director of Strategic Solutions and Chief Cyber Solutions Strategist from May 2014

6   to September 2014, and stated that the integration was going poorly because multiple people were

7   serving in duplicate roles, and Mandiant and FireEye was "operating on different sets of sales

8   projections."  Id. at ¶¶106.

9       CW5 served as a Senior Manager from August 2013 to January 2015, reported to Alden

10  Huen – Senior Manager of Business Systems, and opined that the integration was "difficult"

11  because Mandiant "had not brought over some of their systems."  Id. at ¶110, 112.  CW6 was a

12  former Senior Revenue Manager in the UK from May 2014 to August 2014, and allegedly said

13  that executives knew the likelihood of specific deals closing by quarter-end, and that they were

14  getting constant updates from Salesforce.  Id. at ¶118.  CW7 served as a former Senior Director of

15  Sales from May 2014 to April 2015, tracked deals, and participated in weekly calls that discussed

16  sales in various regions.  Id. at ¶119.

17      The FAC satisfies the particularity requirements with respect CWs 1-6.  Each of these

18  witnesses' job title, length of time employed at FireEye, and statements made are described with

19  adequate specificity.  Moreover, these witnesses were in a position to know the alleged

20  information with reasonable probability.  It is not clear, however, what statements CW7 made or

21  why his or her input is needed.  As such, the FAC fails to satisfy the particularity requirement with

22  respect to CW7.

23                    **2.      The Mandiant Integration**

24      Plaintiffs allege Defendants falsely represented that the Mandiant Integration was

25  progressing successfully.  According to Plaintiffs, Defendants failed to disclose a significant post

26  integration slowdown in sales, a lengthening of sales cycles due to integration inefficiencies,

27
    Case No.: 5:14-cv-05204-EJD
28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1   increased competition in the marketplace, and friction with its channel partners.  Opp. at 17; see

2   also FAC at ¶140.

3        Defendants counter that Plaintiffs' claims and allegations fail because they are unsupported

4   by particularized facts.  Reply at 8-9.  Specifically, they assert that Plaintiffs' allegations are based

5   on "impressions of former employees" and lack important details such as dates, number of

6   customers and partners affected, or deals won by competitors.  Id. at 11.  Moreover, they contend

7   Plaintiffs fail to show how any of these allegations contradict Defendants' statements.  Id. at 12.

8   Finally, Defendants emphasize that their press releases, registration statement, and other public

9   disclosures adequately informed the public of the risks and uncertainties associated with the

10  integration.  Mot. at 16-17.

11       Defendants allegedly made several misrepresentations or omissions during press releases,

12  earnings calls, conferences, technology talks, and various public events from January 2, 2014 to

13  November 2, 2014.  See FAC at ¶¶ 142-203.  The court will address each of these statements in

14  turn.

15       On January 2, 2014, Plaintiffs allege that Defendants made the following

16  misrepresentations:

17   - Mandiant's endpoint products, which are already integrated with the FireEye
18     platform, enable security teams to make faster, more accurate decisions about
        potential security incidents while eliminating blind spots…

19   - The combination of the two companies is a natural extension of [a strategic]
20     partnership and their integrated product offering…

21   - Many customers have now deployed [Mandiant Infinite Response and FireEye
        web] integrated solution, proving the synergy potential between the
22     companies…

23   - …MIR and MSO [both Mandiant products] can drop right into the FireEye
        sales and install base as well as cross-sell into the Mandiant base…so the
24     product synergies here are very strong…

25   - [After the integration, FireEye's business has] a bigger services component; but
        as I mentioned in my comments, on a combined basis services are only going to
26     make up 15% to 17% of our current makeup of revenues…without talking
        about specific percentages…I would tell you the products and the recurring

27                                                    10
28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

subscriptions…will grow faster as a business than the services… you will continue to see that product and product subscription and recurring revenue growth outpace the service part of the business, which would therefore imply that services as a percentage should move to a smaller percentage than that over time.

- [FireEye] looks more like a product company than anything else…On the Mandiant side it is more and more product as well.

¶¶ 148.

According to Plaintiffs, the above statements constitute material misrepresentations or omissions for three reasons.  First, Defendants allegedly concealed problems associated with integrating Mandiant's core MIR solution (a key Mandiant product) with FireEye's platform, leading customers to purchase products from FireEye's competitors.  See FAC at ¶¶ 140, 143, 145, 147, 149, and 151.  Second, that there was significant slowdown in sales due to "mass confusion" and lack of knowledge about the company's new products.  Id.  Third, Plaintiffs assert these problems caused a lengthening of the sales cycles, which Defendants concealed.  Id.

Plaintiffs' allegations are deficient for several reasons.  First, the statement regarding the integration of the two companies' products allowing for more accurate decision making is not contradicted by any of Plaintiffs allegations or arguments.  Moreover, there is no evidence to suggest the security teams were unable to make faster and more accurate decisions about potential security incidents.  In fact, none of Plaintiffs' allegations or arguments directly address this statement.  As such, this allegation fails.

Second, statements such as a combination of two companies is a "natural extension…of a partnership," "product synergies are strong," and companies enjoy "synergy potential" have been found to be examples of corporate optimism.  Grossman v. Novell, Inc., 120 F.3d 1112, 1121-22 (10th Cir. 1997) (holding that statements such as a company had substantial success integrating the sales forces of two companies, and that the merger presented a compelling set of opportunities are non-actionable statements of corporate optimism); see In re Level 3 Comm., Inc. Sec. Litig., 667 F.3d 1331, 1340 (2012) (holding that "this year is really focused on integrating and getting synergies from all those acquisitions" is a vague and meaningless "management-speak" upon

11

1   which *no reasonable investor* would base a trading decision).

2        Moreover, Plaintiffs fail to adequately link the statements made on January 2 with reasons

3   why they are misrepresentations.  Instead, they select statements made by Defendants that

4   generally discuss the integration, list merger issues that most companies face, and urge the court to

5   draw an unreasonable contextual inference.  Without more, Plaintiffs have failed to satisfy the

6   particularity requirement with respect to the statements made on January 2, 2014.

7        Next, on February 11, 2014, Plaintiffs allege that the following statements made by

8   Defendants constitute material misrepresentations:

9         • …the integration is progressing rapidly and smoothly.

10         • …the synergies across every segment of the combined product road map

11            became more and more evident.

12         • We trained another 350 channel representatives, including 135 reps from
             international distributors and resellers.

13         • We're going to continue to scale services…but not at a faster pace than we are

14             going to be selling products…15% to 17% would be service oriented…

15         • We focused heavily on Mandiant products this past week with…350 of our
             partners, and we made great progress.

16   ¶¶ 152, 155, and 156.  Plaintiffs contend the above statements are material misrepresentations for

17   four reasons.  In addition to concealing a significant sales slowdown that caused "mass confusion,

18   problems associated with the integration of the MIR solution with FireEye's platform, a

19   lengthening of the sales cycles, Plaintiffs contend FireEye omitted to report that it experienced

20   friction with its channel partners.  Id. at ¶¶ 140, 143, 145, 147, 149, 151, 158.

21        The statements made on February 11, 2014 are not actionable.  CEOs and executives of

22   companies that merge with or acquire other companies often describe ongoing mergers as smooth,

23   rapid, and successful – which courts regularly deem corporate puffery.  See Grossman, 120 F.3d at

24   1121-22 (reasoning that "moving rapidly to a fully integrated sales force…" is a vague statement

25   of corporate optimism that courts "routinely dismiss"); see In re Level 3, 667 F.3d at 1340

26   (reasoning that a statements such as "…integration of all the acquired companies is progressing

27

28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
      MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1  well and we're beginning to see the benefits of synergies from those transactions" are non-

2  actionable); See In re Dot Hill Sys. Corp. Sec. Litig., 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008)

3  (reasoning that integration of technology was on schedule and continuing smoothly, and already a

4  success was corporate puffery).

5       Next, the accuracy of the statement regarding the 350 partners is not disputed by Plaintiffs,

6  and evidence strongly suggests that the services did in fact constitute 15% to 17% of FireEye's

7  revenue.  See Dkt. No. 76- 13 ("Ex. 13") at 20.  As such, the statements made on February 11,

8  2014 are not actionable misrepresentations.

9       On May 6 and 20, 2014, Plaintiffs allege FireEye made the following misrepresentations in

10  its first quarter earnings call:

- We have had our most successful sales training and partner event [ever] at our inaugural Momentum conference in Las Vegas.

- Moreover, in the subsequent 60 days we conducted over 40 field seminar events…[a]ll in all, we generated explosive growth in incremental pipeline for the Company.

- …[W]e had a record number of cross-sell opportunities, with 15 significant deals where we sold Mandiant and FireEye together…these included some of the largest transaction[s] in the quarter…

- …the amount of leads coming from [recruiting partners is a] really nice metric that is expanding…

- …[the number of no-touch deals that we were getting was] a record for us…

- …the trends and indications are in the right direction for us in terms of what we are doing.

- The head to head battles with any competitor resulted in near flawless execution and win rates.  I would say 100%.

- Any conversions to a competitor…to my knowledge…is zero.  I have not seen a single transaction when somebody moves from FireEye to Wildfire [a competitor]

- …I don't see the competition as a major factor for us…the competitive landscape looks good.

- We had the products integrated at least at some level…

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1

- …we are off to a really good start from a products point of view.

2

- …the FireEye sales team would sell every Mandiant product…

3

- Mandiant business and the FireEye business both were very healthy…both models were really good.

4

5

- We feel confident that…sales are coming online well and performing…[we are having] explosive [pipeline] growth…

6

- …We do a very good job showing the value of our product…our win rates are very high…particularly after we've shown the technology to a company.

7

- [After the incident responses we had] very quick product sales.

8   FAC at ¶¶167, 175.  Plaintiffs assert the above statements are material misrepresentations for

9   several reasons.  In addition to concealing a significant sales slowdown that caused "mass

10  confusion, problems associated with the integration of the MIR solution with FireEye's platform, a

11  lengthening of the sales cycles, omitted to report that it experienced friction with its channel

12  partners, Plaintiffs assert Defendants failed to disclose pushback they experienced from customers

13  that were disinterested in purchasing products from both FireEye and Mandiant.  FAC at ¶176.

14      These statements are not actionable because comments such as FireEye was "off to a really

15  good start from a products point of view," "trends and indications are in the right direction,"

16  "FireEye sales team would sell every Mandiant product," "Mandiant business and FireEye

17  business both were very healthy," and "win rates are very high…," among several others, are

18  typical examples of non-actionable statements of corporate optimism.  See Wozniak v. Align

19  Tech., Inc., 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("outstanding retail results," "business

20  will be good this year," and "industry leading growth," are non-actionable statements of corporate

21  optimism); See In re ECOtality, Inc. Sec. Litig., No. 13-03791-SC, 2014 WL 4634280, *8 (N.D.

22  Cal. Sep. 16, 2014) (reasoning that "we're doing well and I think we have a great future,"

23  "everything is clicking," and "old products are doing well" are non-actionable statements of

24  corporate optimism) (citations and internal quotations omitted); see also In re Dot Hill, 594 F.

25  Supp. 2d at 1158 (reasoning that stating integration of technology was on schedule, continuing

26  smoothly, and already a success constitutes a non-actionable statement of corporate optimism).

27                                                              14

Case No.: 5:14-cv-05204-EJD

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

United States District Court
Northern District of California

1        Accordingly, the statements made on May 6 and 20, 2014 are examples of non-actionable

2  statements of corporate optimism and puffery.

3        Finally, on May 29, and in June, August, and September, and November of 2014, Plaintiffs

4  allege Defendants made the following materially misrepresentations:

5
- Product revenue in our business would be 40% to 45% of the mix…we have
6  reiterated that guidance for the year.

7  - [with respect to the acquisition] we [have] had a good start…we spent about
8000 hours worth of training to get both sales forces up to speed on our
8  technologies.

9  - …the mix between product revenue and product subscription revenue is not a
factor for the way we look at our business…In fact we almost like more product
subscription than we like product because it creates a longer-term ratable
10  business model for the company…

11  - We had a blend difference between product and product subscription in the
quarter largely due…[to the Mandiant Integration]
12

13  - [We are not]…restructuring [the]…sales operations…We're just trying to bring
in some new leadership…[there is] no major change…

14  - The number of companies that we've cross-sold to is picking up…they are
shortening the sales cycle…
15

16  - …We…did a lot better in Q2 than we did in Q1 when it came to cross-
selling…the competition really hasn't had any impact that's of notice.

17  - Sales cycles have been very consistent…when we compete head-on…we feel
we have a substantial gap.
18

19  - We think the pipeline and outlook looks good…purchasing products is a
primary driver…our sales force is making great progress ramping up

20  - We haven't lost our channel partners… [t]hey remain very strong, in terms of
relationships… we've spent a lot of time with the channel to ensure that…
21  conflicts are addressed…the significant majority of the time…it really hasn't
been a problem.
22

23  - I don't think that there was restructuring…we're going to have some overlap in
employees…We may have hired into some regions that…may not have been
24  exactly where we should have made our bets…

25  - …I can't be more pleased [with the Mandiant acquisition]…We are finding
ourselves with a tremendous amount of synergy…

26  FAC at ¶¶167, 175, 176, 178, 179 181-203.  According to Plaintiffs, these statements are

27  15

Case No.: 5:14-cv-05204-EJD

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

1  misrepresentations because the CWs allegedly said Defendants failed to disclose that there was a

2  slowdown and mass confusion in the sales force, lengthening of the sales cycles, pushback from

3  customers, and friction with its channel partners.  Additionally, Plaintiffs assert Defendants'

4  statement regarding restructuring was an omission because it failed to disclose that the company

5  had terminated employees due to integration issues.  Id. at ¶¶ 201.  According to Plaintiffs, the

6  termination of employees negatively impacted product sales.  Id. at ¶¶ 200-201.

7      The statements made in May, June, August, September, and November of 2014 are non-

8  actionable because they represent typical examples of puffery and corporate optimism, were not

9  directly contradicted or addressed by Plaintiffs, or were simply statements of fact.  Additionally,

10  the court does not find Plaintiffs assertion that FireEye failed to discuss alleged layoffs a material

11  omission.

12      "[A]n omission is material if there is a substantial likelihood that the disclosure of the

13  omitted fact would have been viewed by the reasonable investor as having significantly altered the

14  total mix of the information made available."  Juniper Networks, 880 F. Supp. 2d at 1061

15  (citations and internal quotations omitted) (emphasis added).

16      Here, the question posed to DeWalt during the August 5, 2014 earnings call specifically

17  referenced restructuring within the sales department.  See FAC at ¶ 185.  DeWalt denied that there

18  was any restructuring.  See FAC at ¶¶ 185, 186.  Plaintiffs' argue that this denial constitutes an

19  material omission of the lay-offs that occurred within the company.  However, a reasonable

20  investor would discern from DeWalt's complete response that he was merely trying to clarify

21  ambiguities regarding the word "restructuring."  Moreover, DeWalt *admitted* that there was "some

22  overlap of employees." From this, a reasonable investor would infer that layoffs were imminent or

23  could have already occurred.  And since Plaintiffs fail to provide details regarding the extent and

24  severity of layoffs (other than a conclusory statement that it was a "mass-layoff"), it cannot be

25  found that there was a significant alteration in the total mix of information available to reasonable

26  investors.  See FAC at ¶¶102-103.  As such, the alleged omission is non-material.

Case No.: 5:14-cv-05204-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In sum, Plaintiffs have inadequately pled material misrepresentations with respect to the

2    Mandiant Integration.

3                    **3.      Product Revenue, Revenue Recognition Policy Change, and
                              Services Revenue**

4         Plaintiffs' allege Defendants' failure to disclose integration problems adversely impacted

5    product revenue, causing a 22.84% reduction in the stock price on May 7, 2014 and a 14.98% drop

6    in the stock price in November of 2014.  Opp. at 13, 14, 18-19.  Additionally, they contend

7    Defendants' belated announcement of a change in revenue recognition policy of its email product

8    caused an 11.42% reduction in the stock price.  Finally, Plaintiffs assert Defendants downplayed

9    the services component of overall revenue.  Opp. at 18-19; see also FAC at ¶ 19.  Defendants

10   dispute Plaintiffs' allegations, asserting that they lack particularity, while emphasizing that

11   FireEye met all its guidance estimates.  Id. at 9-10.  Defendants then contend that the service

12   component accounted for 16.9% of total revenue, which was within the 15%-17% range initially

13   projected.

14        Plaintiffs' allegation that FireEye's stock price dropped due to Defendants failure to

15   disclose integration problems is deficient – primarily because it is an unreasonable, self-serving

16   inference, that is unsupported by the facts.  No analyst expressly stated that the 22.84% or 14.98%

17   drop was due to Defendants' inability to meet analysts' earnings estimates.  More importantly,

18   even if an analyst had expressly stated so, Defendants are only bound by or obligated to meet these

19   estimates if they expressly or impliedly agree to do so.  In re Syntex Corp. Sec. Litig., 95 F.3d

20   922, 934 (9th Cir. 1996) ("In order to be liable for unreasonably disclosed third-party forecasts,

21   defendants must have put their imprimatur, express or implied, on the projections."); Id., 95 F.3d

22   at 934.  As such, Plaintiffs' fails to adequately link their self-serving inference to Defendants in

23   any meaningful way, rendering Plaintiffs' allegations deficient.

24        Plaintiffs' allegation regarding Defendants delayed revenue recognition policy is likewise

25   deficient.  Just as in product revenue, Plaintiffs' rely on comments, estimates, and analysts'

26

27                                                 17

28

1   predictions to make their case, while failing to link any statements made by Defendants regarding

2   revenue recognition – express or implicit – with any drop in the share price.  None of the

3   Defendants adopted or agreed with any analyst's prediction regarding recognition policy change.

4   In fact, Defendant Sheridan's statement that this change did not have a significant impact on

5   second quarter results is bolstered by the fact that Defendants met or exceeds their revenue

6   guidance estimates throughout the class period.  See Ex. 5 at 7-8; Ex. 9 at 7; Ex. 10 at 7-8; Ex. 11

7   at 8-9; Ex. 12 at 10; and Ex. 13 at 8-9.

8           Finally, since evidence suggests that the services component was within the 15% - 17%

9   range specified by Defendants, Plaintiffs' allegation that Defendants downplayed the services

10  component is inaccurate, and as such, is deficient.[2]  See Dkt. No. 76- 13 ("Ex. 13") at 20.

11                          **4.      Statutory Safe Harbor Provision**

12          "Forward-looking statements are not actionable as a matter of law if they are identified as

13  such and accompanied by meaningful cautionary statements identifying important facts that could

14  cause actual results to differ materially from those in the forward looking statement."  See Police

15  Retirement Systems of St. Louis v. Intuitive Surgical, Inc., No. 10-CV-03451-LHK, 2012 WL

16  1868874, *10 (N.D. Cal. May 22, 2012) (citations and internal quotations omitted).  "A forward

17  looking statement is any statement regarding (1) financial projections, (2) plans and objectives of

18  management for future operations, (3) future economic performance, or (4) the assumptions

19  underlying or related to any of these issues."  Id. (citations and internal quotations omitted).

20          Defendants identify the following statements as falling under the Safe Harbor Provision:

21      •   We will be able to deliver fully integrated products and services that help
22          organizations protect themselves from attacks

23      •   I believe there's a number of additional near-term opportunities, including the
            ability to sell FireEye's existing products into Mandiant's base of more than
24          500 customers

25  _____

26  [2] Professional Services revenue is $72,103,000, which is 16.94% of the total revenue amount of
    $425,662,000.  See Ex. 13 at 20.

27                                                      18
    Case No.: 5:14-cv-05204-EJD
28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

- Immediate short-term synergy will be the length of the FireEye sales cycle. Being closer to the breach crated by the Mandiant service engine can significantly shorten the product cycles and increase the average sales price

- We're going to continue to scale services people, but not at a faster pace than we are going to be selling products

- We see many synergies between the companies

See FAC at ¶¶8-11, 56-57, 144.

The statement regarding the fully integrated products and services includes the phrase "We will," which indicates that Defendants will, at some point in the future, deliver integrated products and services to its customers.  In re Violin Memory Sec. Litig., No. 13-CV-5486-YGR, 2014 WL 5525946, at *13-14 (N.D. Cal. Oct. 31, 2014) (The phrase "we will" develop a derivative product to our Velocity PCle Flash Memory Card is forward looking).  Next, a reference to additional near-term opportunities is just that – a reference to sales opportunities in the near future, making it a forward looking statement.

The statement that the length of the FireEye sales cycle will be an immediate short-term synergy is an identification of an existing benefit, making it representation of a current fact. Additionally, Defendants comment that they will continue to scale services people, shows that some degree of scaling has already occurred and that future scaling will be calibrated at a pace that is slower than that of products.  Such a statement is a representation of current fact.  Mallen v. Alphatec Holdings, Inc., 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (holding that revenues will continue to grow is a statement that concerns historical and current fact); see also In re TETRA Techs., Inc., Inc. Sec. Litig., No. 4:08-CV-0965, 2009 WL 6325540, at *32 (S.D. Tex. July 9, 2009) (holding that "onshore business continues to grow rapidly" is a statement of historical fact unprotected the Safe Harbor provision).  Finally, the comment that FireEye *sees many synergies* between the companies demonstrates that synergies have already been identified, making it a current representation of fact.  Mallen, 861 F. Supp. 2d at 1126 (holding that "we have already begun to realize synergies" is a representation of historical or current fact).

Since only the first two statements are forward looking, they may fall under the safe harbor

19

United States District Court
Northern District of California

1    provision if accompanied by meaningful cautionary statements.  Prior to the press conference held

2    on January 2, 2014, FireEye's Vice President of Investor Relations, Kate Patterson, informed

3    individuals on the call that FireEye would be making forward-looking statements regarding the

4    company's billing and revenue results, expected benefits of the company's acquisition of

5    Mandiant, product development and integration plans, industry trends and customer adoption of

6    the company's solutions, and the expected capabilities and benefits of integrated and new

7    products.  See Dkt. No. 76-15 at 4.  Patterson also informed individuals that they can refer to the

8    most recent 10-Q filings for a more detailed description of the risks and uncertainties associated

9    with the merger.  Id. at 4.

10        The 10-Q form provides a comprehensive list of disclosures with factors that FireEye

11    admits might delay product releases.  For starters, with respect to fully integrating products and

12    services, the operative disclosure states: "Although the market expects rapid introduction of new

13    products…the development of these products and enhancements is difficult and the timetable for

14    commercial release and availability is *uncertain* because there can be significant time lags

15    between initial beta releases and the commercial availability of new products and enhancements."

16    Dkt. No. 76-6 at 8.  Additionally, Defendants admitted that they may experience "unanticipated

17    delays" in the availability of new products and enhancements to its platform and fail to meet

18    customer's timing expectations.  The disclosures also identify several new products like the

19    NX1000, Oculus, and SaaS.  When viewed in totality, these disclosures constitute meaningful

20    cautionary statements.  See In re Violin, 2014 WL 5525946, *13-14 (holding that disclosures

21    about the successful development and completion of a specific product like the PCLE card being

22    uncertain constitutes an extensive and substantive disclosure); see also Plevy v. Haggerty, 38 F.

23    Supp. 2d 816, 832 (C.D. Cal. 1998) (reasoning that a company's abundant and specific risk

24    disclosures puts the investing public on notice and the public "cannot be heard to complain that

25    the risks were masked as mere contingencies.").

26        With respect to selling FireEye's products to Mandiant customers, Defendants extensively

20

27    Case No.: 5:14-cv-05204-EJD

28    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   discuss competitors such as Cisco Systems, IBM, HP, and Juniper that might "emulate or integrate

2   virtual-machine features similar to [FireEye's] into their own products," all of which would

3   adversely affect FireEye's revenue.  Dkt. No. 76-6 at 7.  Moreover, Defendants emphasize the fact

4   that its larger competitors have "substantially broader product offerings," which would discourage

5   users from purchasing their products.  Id.  These admissions clearly identify the factors that would

6   affect the company's product sales, making them meaningful cautionary disclosures.  For all of

7   these reasons, the first two statements fall within the Safe Harbor provision, and Plaintiffs will be

8   precluded from relying on them to support their misrepresentation allegations.

9                   **ii.      Scienter**

10          In addition to satisfactorily alleging falsity, Plaintiffs in securities fraud actions must state

11  with particularity the "facts evidencing scienter, i.e., the defendant's intention to deceive,

12  manipulate, or defraud."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)

13  (citations and internal quotations omitted).  "The Ninth Circuit has articulated a two-part inquiry

14  for scienter: first, [the court must] determine whether any of the allegations, standing

15  alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is

16  sufficient, ... the court [must] conduct a holistic review of the same allegations to determine

17  whether the insufficient allegations combine to create a strong inference of intentional conduct or

18  deliberate recklessness."  Brown v. China Integrated Energy, Inc., 875 F. Supp. 2d 1096, 1105

19  (C.D. Cal 2012) (citations and internal quotations omitted).

20          The court must evaluate scienter in the context of the entirety of the complaint.  Tellabs,

21  551 U.S. at 323.  A strong inference of scienter will be "cogent and at least as compelling as any

22  opposing inference of non-fraudulent intent."  Id. at 314.  A complaint will survive "only if a

23  reasonable person would deem the inference of scienter cogent and at least as compelling as any

24  opposing inference one could draw from the facts alleged."  Id. at 324.

25                  **1.   Confidential Witness Statements**

26          Plaintiffs assert that the CW witness allegations support an inference of scienter because

27                                              21

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

the CWs are numerous and possess first-hand knowledge of the allegations.  Opp. at 24.

Defendants counter that the CW allegations are not sufficient to satisfy the scienter requirement

because the CWs did not have personal contact with Defendants, asserted vague allegations, and

were low-level employees with no access to company-wide information.  Reply at 14-15.

"To satisfy the PSLRA, a complaint relying on statements from confidential witnesses

must past two hurdles."  Zucco, 552 F.3d at 995.  "First, the confidential witnesses whose

statements are introduced to establish scienter must be described with sufficient particularity to

establish their reliability and personal knowledge."  Id.  (citations and internal quotations

omitted.).  "Second, those statements which are reported by confidential witnesses with sufficient

reliability and personal knowledge must themselves be indicative of scienter."  Id.  Conclusory

allegations are typically insufficient to establish scienter.  In re Cadence Design Sys., Inc. Sec.

Litig., 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009) ("conclusory allegations that a defendant

must have known about particular wrongdoing are, standing alone, generally insufficient.").

For the reasons previously stated, the first prong has been satisfied with respect to CWs 1-

6.  The job title, length of time employed at FireEye, and statements made by these CWs was

described with adequate specificity.  Moreover, these witnesses were in a position to know the

alleged information with reasonable probability.  It is not clear, however, precisely what CW7 said

or why his or her input is needed.  As such, the FAC fails to satisfy the particularity requirement

with respect to CW7.  As such, the court reiterates that it will consider the statements made by

each of these confidential witnesses.

Upon review, however, it is clear that the CW statements fail to establish a strong

inference of scienter.  CW6 merely asserts that he participated in a "war room" on the last days of

the quarter calling sales, and that the Salesforce software "constantly" updated FireEye employees.

Opp. at 25-26.  However, there is no allegation, indication, or evidence that CW6 was instructed to

misrepresent the status of the Mandiant integration, FireEye's financial condition, or otherwise

omit material information.  In re Cadence, 654 F. Supp. 2d at 1047 (reasoning that a CW that was

22

United States District Court
Northern District of California

not instructed to do anything wrong is a factor that weighs against scienter).  CW6's participation in a meeting is merely routine corporate activity - hardly indicative of scienter.

CWs 2-5 allegedly said that the acquisition created "a lot of confusion," loss of channel business was "a very big deal," and that the cultures of the two companies lacked synergy.  FAC at ¶107.  There is no adequate explanation, however, of what "a very big deal" meant or whether the lack of synergy resulted in FireEye suffering a quantifiable adverse effect.  The CWs entirely fail to support their allegations with concrete and readily verifiable figures or explanations.  As such, these statements also fail to support an inference of scienter.

Finally, CW1 purportedly said that there were integration issues with the MIR product, which required the product team to "babysit" customers while the problem was resolved.  These are typical examples of delays and corporate mismanagement - insufficient to satisfy the scienter requirement.  See Sorkin, LLC v. Fischer Imaging Corp., No. 03-CV-00631-R, 2005 WL 1459735, *10 (D. Col. Jun. 21, 2005) (holding that vague allegations about customer complaints or quality control problems do not establish scienter); see also Anderson v. Spirit Aerosystems Holdings, Inc., 827 F.3d 1229, 1239-40 (10th Cir. 2016) ("generalized descriptions…of delays and mismanagement do not contribute to a cogent, compelling inference of scienter.").

For all of the above reasons, the CW statements when viewed individually or holistically, fail to justify an inference of scienter.

### 2.  Defendants' Stock Sales

Plaintiffs contend that the amount, timing, and inconsistent nature of Defendants' stock sales support an inference of scienter.  Opp. at 27.  Specifically, Plaintiffs allege that stock sales amounting to $66 million - constituting 17.6%, 8.7%, and 15% of DeWalt, Mandia, and Sheridan's stock holdings - are large and suspicious enough to support an inference of scienter. Id.  Additionally, Plaintiffs contend the timing of the stock sales is suspect because it was sold near all-time highs, and while officials were making optimistic statements about the company's financial condition.  Id. at 28.  Finally, Plaintiffs argue that these sales were inconsistent because

23

United States District Court
Northern District of California

1    Defendant did not sell any shares in the year following the secondary public offering.  Id.

2    Defendants counters that the stock sales are not suspicious because higher percentage of

3    stock sales have been found to be insufficient indications of scienter.  Reply at 16.  Moreover,

4    Defendants asserts they sold stocks *during* and not after the public offering.  Id. at 17.  Finally,

5    Defendants contend that since they were "legally forbidden to trade before and after the secondary

6    offering," an inference of scienter cannot be drawn.  Id. at 17-18.

7        "Unusual or suspicious stock sales by corporate insiders may serve as circumstantial

8    evidence of the requisite scienter but only if the insider trading is dramatically out of line with

9    prior trading practices at times calculated to maximize the personal benefit from undisclosed

10   inside information."  In re Splash Tech. Holdings, 160 F. Supp. 2d 1059, 1081 (N.D. Cal. 2001)

11   (citations and internal quotations omitted).  "Relevant factors to consider when determining

12   whether stock sales meet this standard are: (1) the amount and percentage of shares sold; (2) the

13   timing of the sales; and (3) the consistency between the sales and the insider's prior trading

14   history."  Id.; see also Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (same).  "Although

15   viable circumstantial evidence of scienter, stock sales alone cannot create a strong inference of

16   scienter."  In re Splash, 160 F. Supp. 2d at 1081 (citations and internal quotations omitted).

17       Here, Dewalt, Mandia, and Sheridan collectively sold stocks worth $66 million.  Plaintiffs

18   allege this amount equates to 17.6%, 8.7%, and 15% of Defendants total stock holdings, instead of

19   Defendants stated percentages of 9.5%, 7%, and 9.6%.  This discrepancy, Plaintiffs assert, was an

20   attempt on the part of Defendants to distort the stock percentages sold by including both unvested

21   and vested stocks.  These and other facts, Plaintiffs assert, support a strong inference of scienter.

22   The court disagrees.

23       Even if Plaintiffs calculations are taken at face value, courts have held that higher

24   percentages of stock sales failed to raise a strong inference of scienter.  Silicon Graphics, 183 F.3d

25   at 987-88 (9th Cir. 1999) (no scienter inference when stocks sales were in excess of 75.3% of

26   stock holdings); Meltzer, 540 F.3d at 1049, 1067 (9th Cir. 2008) (holding that there was no

27                                              24

28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1   scienter even when one defendant sold 37% of his stock holdings and another sold 100%); In re

2   ImmersionCorp. Sec. Litig., No. C–09-4073-MMC, 2011 WL 871650, *7 (N.D. Cal. Mar. 11,

3   2011) (holding that defendants that sold 100% and 92.88% of current stock, but retained 79.11%

4   and 90.28% of their total holdings when exercisable options were included failed to raise a strong

5   inference of scienter).

6       Plaintiffs rely primarily on No. 84 Employer-Teamster Joint Council Pension Trust Fund

7   v. Corp. v. American West Holding Corp.., Nursing Home Pension Fund, Local 144 v. Oracle

8   Corp., Batwin v. Occam Networks, Inc., and In re SeeBeyond Tech. Corp. Sec.Litig. to support

9   their arguments.  See 320 F.3d 920 (9th Cir. 2003); 380 F.3d 1226 (9th Cir. 2004); No. CV-07-

10  2750-CAS, 2008 WL 2676364, at *1 (C.D. Cal. July 1, 2008); 266 F. Supp. 2d 1150 (C.D. Cal.

11  2003).  However, the facts and circumstances surrounding the stock sales in these cases are

12  distinguishable from the current case.

13      In Am. West, the court ruled that the investors stock sales were suspicious because

14  they were dramatically out of line with prior trading practices, totaling nearly 100% of their stock

15  holdings.  Am. West, 320 F.3d at 939 ("Most of the individuals sold 100% of their shares, with the

16  lowest percentage being 88%").  In contrast, Defendants sold their FireEye stock only during the

17  secondary public offering, had no prior trading history, and retained a majority of their shares.

18  Moreover, the court in Am. West cautions against inferring scienter simply because the amount

19  and percentages of the sales are large.  320 F.3d at 939.

20      And while the court in Oracle Corp. ruled that the stocks sold by Oracle's CEO Larry

21  Ellison, which amounted to $900 million and constituted 2.1% of his stock holdings, was "truly

22  astronomical," this fact cannot be seen in isolation.  The Oracle Corp court notes that there were

23  improper accounting records kept, customers had inadvertently overpaid Oracle, and Ellison sold

24  his stock at a time when several of Oracle's business deals fell through, causing a significant

25  reduction in Oracle's earnings.  380 F.3d at 1232.  No such accounting irregularities or dubious

26  business practices are alleged here.  Defendants also met or exceeded their guidance expectations

27  25

28  Case No.: 5:14-cv-05204-EJD
    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   throughout the class period.

2       *Batwin* is non-analogous because the *Batwin* court reasoned there were significant

3   violations of GAAP that took place over an extended period of time, including premature

4   recognition and overstating of company revenues.  *Batwin*, 2008 WL 2676364, at *13-14.  Finally,

5   the court in *SeeBeyond* reasoned that Defendants deliberately misled investors and analysts by

6   making it seem as if they voluntarily deferred their revenue announcements.  In fact, they were

7   instructed to defer revenue disclosure by an outside accounting firm – E & Y.  266 F. Supp. 2d at

8   1169 (C.D. Cal. 2003).

9       Here, in contrast to the above cases, there are no allegations of GAAP violations, and

10  certainly no evidence that indicates Defendants were informed to delay disclosures of their

11  earnings reports.  Instead, Defendants retained approximately 82.4% to 91.3% of their total

12  holdings, had no prior trading history, and would suffer significant losses if FireEye's stock price

13  dropped – facts that weighs against an inference of scienter.  See *In re Hansen Natural Corp. Sec.*

14  *Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007).

15      Next, Plaintiffs' argument that the timing and consistency of Defendants sales supports

16  scienter is also unpersuasive for several reasons.  Even assuming Defendants sold their stocks at a

17  price that was close to the stock's all-time high, "this alone is not sufficient for scienter purposes."

18  *In re Tut. Sys, Inc. Sec. Litig.*, No. C-01-02659-CW, 2002 WL 35462358, *11 (N.D. Cal. Aug. 15,

19  2002).  Moreover, Plaintiffs' reliance on *In re Tut Sys.* is misplaced.  In *In re Tut Sys.*, Defendants

20  sold significant portions of their holdings – 46.5% – within a very short time, while here,

21  Defendants sold at most 17.6% of their stock holdings.  Third, since Defendants entered into lock-

22  up agreements before and after the secondary public offering, they lack a meaningful trading

23  history, which weighs against a finding of scienter.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d

24  1079, 1095 (9th Cir. 2002); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006)

25  ("Without a meaningful trading history…the Court cannot conclude that Bax's trades were

26  suspicious and thus supportive of scienter.").

27                                          26

28

1   For all of the above reasons, Plaintiffs have failed to establish that the stock sales support a

2   strong inference of scienter.

3   ### 3.  Core Operations Theory

4   Core Operations may support a strong inference of scienter under following three

5   circumstances:

6   First, the allegations may be used in any form along with other
    allegations that, when read together, raise an inference of scienter

7   that is cogent and compelling, thus strong in light of other
    explanations…Second, such allegations may independently satisfy

8   the PSLRA where they are particular and suggest that defendants
    had access to the disputed information…Finally, such allegations

9   may conceivably satisfy the PSLRA standard in a more bare form,
    without accompanying particularized allegations, in rare

10  circumstances where the nature of the relevant fact is of such
    prominence that it would be absurd to suggest that management was

11  without knowledge of the matter.

12  South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785-86 (9th Cir. 2008).  More importantly, the

13  role of corporate officers and their access to information may support a strong inference of

14  scienter if supported by "detailed and specific allegations about the management's exposure to

15  factual information within the company."  In re Maxwell Technologies, Inc. Sec. Litig., 18 F.

16  Supp. 3d 1023, 1041 (S.D. Cal. 2014).  "In rare circumstances, particularized allegations are not

17  needed where the nature of the relevant fact is of such prominence that it would be absurd to

18  suggest that management did not have knowledge of it."  Id.

19  Here, Plaintiffs' argue that a strong inference of scienter can be drawn from the following

20  facts: Defendants were high level corporate officers that attended board meetings, had a "hands-

21  on" management style, and could access FireEye's reports, press releases, public filings, and other

22  statements.  FAC at ¶ 248.  The court disagrees.  While informative, more is needed to establish a

23  strong inference of scienter.  In re Peoplesoft, Inc., No. C-99-0472-WHA, 2000 WL 1737936, at

24  *4 (N.D. Cal. May 25, 2000); see In re Taleo Corp. Sec. Litig., No. C-09-00151-JSW, 2010 WL

25  597987, *8 (N.D. Cal. Feb. 17, 2010) ("[g]eneral allegations of defendants' hands on management

26  style, their interaction with other officers and employees, their attendance at monthly

27  27

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
    MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

1    meetings…are not sufficient to establish scienter") (citations and internal quotations omitted); see

2    also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 843-44 (N.D. Cal. 2000) (similar).  At a

3    minimum, Plaintiffs needed to have provided information about precisely what was said by the

4    parties in these meetings, which facts the Defendants were exposed to, and why this exposure

5    supports an inference of scienter.  Plaintiffs also fail to provide evidence that suggests the current

6    circumstances are somehow rare, which justifies an inference of scienter without particularized

7    allegations.

8            As such, Plaintiffs allegations fail to raise a strong inference of scienter under the core

9    operations theory.

10                          **4.  Replacement of Head of Sales**

11           Plaintiffs assert Defendant's announcement of a new Head of Sales bolsters an inference of

12   scienter.  Opp. at 30.  Defendants counter that facts of the case are non-analogous to the facts in

13   cases cited by Plaintiffs because the head of sales remained part of the company and took on a

14   different role while the individuals in Plaintiffs' cases were no longer employed by the company.

15   Reply 19-20.

16           Plaintiffs' arguments are unpersuasive.  Since the court has found that Plaintiffs' other

17   scienter allegations fail to support a strong inference of scienter, the determinative inquiry is

18   whether a replacement of the Head of Sales, when viewed in conjunction with these failed

19   allegations, supports an inference of scienter.  The court finds that it does not.  Where, as here, a

20   replacement of the head of sales support is unaccompanied by any additional evidence of

21   wrongdoing on the part of the Defendants, an inference of scienter is unlikely.  See In re Downey

22   Sec. Litig., No. CV-08-3261-JFW, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) (holding

23   that Plaintiffs allegations fail to support an inference of scienter if the facts alleged do not suggest

24   any wrongdoing or fraudulent activity associated with employee terminations); see also Middlesex

25   Retirement System v. Quest Software Inc, 527 F. Supp. 2d 1164 (C.D. Cal. 2007) (holding that

26   scienter exists when an officer resigned in order to *avoid cooperating* with an internal

27                                                           28

28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
     MOTION TO STRIKE AS MOOT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    investigation).

2            Accordingly, the replacement of head of sales fails to support a strong inference of

3    scienter.  In sum, the above allegations, when viewed individually and collectively, fail to support

4    a strong inference of scienter.

5                          **iii.       Loss Causation**

6            The element of loss causation needs to be analyzed only if the second element of scienter is

7    satisfied.  In re Verifone Sec. Litig., No. 5:13-CV-01038-EJD, 2016 WL 1213666, at *9 (N.D.

8    Cal. Mar. 29, 2016); see Stevens v. InPhonic, Inc., 662 F. Supp. 2d 105, 125 (D.C. 2009); see also

9    In re AOL, Inc. Repurchase Offer Litig., 966 F. Supp. 2d 307, 312 (S.D.N.Y. 2013).  "To prove

10   loss causation, the Plaintiffs must demonstrate a causal connection between the deceptive acts that

11   form the basis for the claim of securities fraud and the injury suffered by the Plaintiffs."  Oregon

12   Public Employees Retirement Fund v. Apollo Grp., 774 F.3d 598, 608 (9th Cir. 2014) (citations

13   and internal quotations omitted.).

14           Here, since Plaintiffs fail to satisfactorily plead the material misrepresentation and scienter

15   elements, the loss causation analysis is unnecessary.

16   **V.      SCHEME LIABILITY – Rules 10b-5(a) and (c)**

17           Plaintiffs assert they have adequately plead a claim under scheme liability because of

18   Defendants' deceptive conduct, including making false and misleading statements about the

19   Mandiant integration.  Opp. at 32.

20           Where a Plaintiff's sole basis for scheme liability arises out of the alleged

21   misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim, courts have reasoned

22   that scheme liability does not apply.  Scott v. ZST Digital Networks, Inc., 896 F. Supp. 2d 877,

23   893 (C.D. Cal. 2012) (citations and internal quotations omitted).

24           Here, the court finds that Plaintiffs scheme liability claim fails because it rests entirely on

25   the allegations that form the basis of the 10b-5(b) claim.  See S.E.C. v. Mercury Interactive, LLC,

26   No. 5:07-CV-02822-WHA, 2011 WL 5871020, at *2 (N.D. Cal. Nov. 22, 2011) (citing WPP

                                                     29

27
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING PLAINTIFFS'
28   MOTION TO STRIKE AS MOOT

1  Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011)).

2       Accordingly, Plaintiffs' scheme liability claim fails.

3  **VI.    CONTROL PERSON CLAIM – Section 20(a)**

4       Plaintiffs assert Defendants' day-to-day control over FireEye's operations is enough for

5  them to state a claim under scheme liability.  Opp. at 33.

6       Congress established liability under § 20(a) for "[e]very person who, directly or indirectly,

7  controls any person liable" for violations of the securities laws.  15 U.S.C. § 78t(a).  To prevail on

8  its claim under Section 20(a) of the Securities and Exchange Act ("Exchange Act"), Plaintiff must

9  demonstrate "a primary violation of federal securities law" and that "the defendant exercised

10  actual power or control over the primary violator."  Zucco, 552 F.3d at 990.  Section 20(a) claims

11  may be dismissed if plaintiff "fails to adequately plead a primary violation of section 10(b)."  Id.

12       Since Plaintiffs fail to allege a viable Section 10(b) or Rule 10b-5 claim, the court finds

13  that Plaintiffs have likewise failed to adequately allege a Section 20(a) claim.  Id.

14  **VII.   CONCLUSION**

15       For the reasons stated above, the court GRANTS Defendants' motion to dismiss with leave

16  to amend.  Any amended complaint must be filed within fifteen days of the date of this Order.

18       **IT IS SO ORDERED.**

19  Dated:  November 14, 2016



EDWARD J. DAVILA
United States District Judge

27          30

United States District Court
Northern District of California